1   SAMANTHA CHOE (SBN: 252002)
    schoe@cov.com
2   ADDISON THOMPSON* (SBN:330251)
    athompson@cov.com
3   SYLVIA HUANG* (SBN: 313358)
    syhuang@cov.com
4   ANNIE SHI (SBN: 327381)
    ashi@cov.com
5   **Covington & Burling LLP**
    415 Mission St., Ste. 5400
6   San Francisco, CA 94105
7   Telephone:  (415) 591-6000

8   [Additional counsel listed on next page]

9   * *C.D. California admission application forthcoming*

10  *Attorneys for Plaintiffs*

11
12
13              **UNITED STATES DISTRICT COURT**

                **CENTRAL DISTRICT OF CALIFORNIA**

                **EASTERN DIVISION**

14
15   RICHARD HART, ERVIN          | **Case No.  5:20-cv-1559**
     LONGSTREET, ALDO
16   HERNANDEZ, CHARLES GLUCK,    | **CLASS ACTION**
     AND GRAHAM WALDROP,
17   individually and on behalf of all others
     similarly situated,         | **COMPLAINT FOR INJUNCTIVE
                                    AND DECLARATORY RELIEF**
18              Plaintiffs,

19   v.

20   STEPHANIE CLENDENIN, Director
     of California Department of State
21   Hospitals, in her official capacity;
     JANINE WALLACE, Executive
22   Director of Patton State Hospital, in her
     official capacity,
23
                Defendants.
24
25
26
27
28

                                    1

JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 247391)
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)
Kim.Pederson@disabilityrightsca.org
**Disability Rights California**
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone:  (510) 267-1200
Facsimile:   (510) 267-1201

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**INTRODUCTION**

1.     Plaintiffs Richard Hart, Ervin Longstreet, Aldo Hernandez, Charles Gluck, and Graham Waldrop (collectively, "Plaintiffs") bring this class action lawsuit because they and others who are similarly situated are at risk of becoming severely ill or dying from COVID-19 while being held at Patton State Hospital, one of the largest psychiatric hospitals in the country.  Stephanie Clendenin, Director of the California Department of State Hospitals ("DSH") and Janine Wallace, Director of Patton State Hospital ("DSH-Patton") (collectively, "Defendants") are holding Plaintiffs at this locked facility pursuant to involuntary psychiatric commitments.  As of the date of this filing, at least 112 patients and 147 facility staff at DSH-Patton have tested positive for COVID-19.  At least two patients have died from complications after contracting the virus.  In light of the life-threatening dangers posed by the growing COVID-19 outbreak, Plaintiffs seek immediate action to protect the health and well-being of DSH-Patton patients, including through discharge or transfer to safer, non-congregate settings.

2.     With each passing day, the grave threat of SARS-CoV-2, the coronavirus responsible for the COVID-19 pandemic, increases at DSH-Patton.  The facility is in the midst of an outbreak.  There is no vaccine for the virus.  There is no effective treatment.  Although DSH-Patton provides psychiatric treatment to patients, it is not equipped to provide essential medical care.  Mounting evidence indicates that transmission of COVID-19 is airborne and is particularly dangerous in congregate settings, like DSH-Patton, with close contact and poor ventilation.  The Centers for Disease Control and Prevention ("CDC") advises that the only effective means of limiting transmission of the novel coronavirus is through "social distancing" and rigorous personal hygiene.  This is impossible for Plaintiffs and other patients of DSH-Patton, given their conditions of confinement.

3.     DSH-Patton resembles a jail or prison facility more closely than a community-based medical hospital or treatment center.  The facility holds more than

1,500 patients overall and employs over 2,000 staff members.  Defendants confine patients to locked units that consist of approximately fifty (50) people, all of whom share one bathroom, one eating area, one communal lounge area, and a few telephones. Patients report that, contrary to DSH protocols, Defendants do not routinely sanitize high-touch common surfaces, including tables, chairs, and telephones, between use by different patients.  Staff rotate through the units constantly, and do not wear masks consistently when interacting with patients.

4. Defendants' failure to take steps to limit the spread of COVID-19 at DSH-Patton poses a serious threat to Plaintiffs' lives and well-being.  Plaintiffs all have conditions and factors that, according to the CDC, make them highly vulnerable to severe illness or death if they contract COVID-19.  For example, Plaintiff Hart is a 66-year-old lung cancer survivor with Chronic Obstructive Pulmonary Disease ("COPD").  Plaintiffs Longstreet, Hernandez, Gluck and Waldrop have a range of serious medical conditions that include coronary artery disease, kidney and liver conditions, hypertension, diabetes, and obesity.  According to the CDC, these conditions and factors make Plaintiffs and others with similar conditions vulnerable to severe medical complications and death from COVID-19.  Plaintiffs and many other patients at DSH-Patton also have other risk factors, such as those related to age and race, that increase the likelihood of severe complications from COVID-19.

5. By this class action, Plaintiffs seek to represent all individuals confined at DSH-Patton during the COVID-19 pandemic who, pursuant to CDC guidelines, are or might be at high risk for becoming severely ill or dying from COVID-19 (the "Class"). A substantial number of patients held at DSH-Patton—almost certainly several hundred people, who are identifiable through review of basic medical and other records—qualify as "high risk" based on the CDC's guidelines.

6. In response to this pandemic, courts and custodial authorities across the country have prioritized releasing high-risk detainees to protect both the detainees' health

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

and the public's health.  Doing so not only protects the detained individuals with the greatest vulnerability to severe illness and death from contracting the virus, but also contributes to risk mitigation for the other people in detention as well as the facility staff who live among the public.

7.    In contrast, Defendants have taken no meaningful steps to modify their policies and procedures to facilitate the release or transfer of Plaintiffs and others similarly situated to safer settings, despite the serious threat that the COVID-19 outbreak poses to their lives.  On information and belief, Defendants have denied every request made by Plaintiffs and other high-risk patients to be moved to a safer, non-congregate setting.  Among those Defendants have refused to move are patients who have completed or are close to completing their treatment goals at DSH, and patients who have identified community placements where they can safely shelter in place and receive treatment in a non-congregate setting.  Even for patients who do not meet the current criteria for discharge to the community, it is inhumane and unconscionable to keep them in a setting where they are unable to protect themselves from infection.

8.    Defendants are putting the lives of DSH-Patton[1] patients in danger by

---

[1] Alarming outbreaks are also occurring in other DSH facilities.  For example, at DSH-Metropolitan located in Norwalk, California, at least 66 patients and at least 58 staff members and onsite personnel have tested positive for COVID-19.  At DSH-Coalinga, at least 28 patients and at least 32 staff members and onsite personnel have tested positive for COVID-19; at least one DSH-Coalinga patient has died after contracting COVID-19.  In the last several days, there have been reports that DSH has begun abruptly moving some DSH-Coalinga patients to DSH-Napa, another crowded, congregate state hospital that has to-date had a small number of patients test positive for COVID-19.  This sudden transfer process, done without any transparency as to the process, raises grave concerns that DSH may be moving down the same catastrophic path that the California Department of Corrections and Rehabilitation ("CDCR") went down in conducting hasty transfers of COVID-19-infected patients to San Quentin State Prison.  *See* Jason Pohl, *'Horribly botched.' Lawmakers slam California prisons for 'out-of-control' COVID-19 infections*, SACRAMENTO BEE Jul. 1, 2020, https://www.sacbee.com/news/coronavirus/article243935832.html; Rong-Gong Lin II & Sean Greene, *San Quentin prison coronavirus outbreak 'tragic, predictable and*

holding them in crowded, congregate living spaces in the midst of a COVID-19 outbreak. Defendants' continued confinement of Plaintiffs and other high-risk patients at DSH-Patton violates the Due Process Clause of the Fourteenth Amendment and Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134.  Plaintiffs bring this action on behalf of themselves and others similarly situated in order to remedy these violations.

9.    Unless this Court intervenes to order Defendants to take immediate steps to protect DSH-Patton patients, including by effectuating the discharge or transfer of Plaintiffs to safer, non-congregate settings, Plaintiffs and the class of people they seek to represent are at grave risk of irreparable harm, including contracting COVID-19, becoming severely ill, and dying.

## JURISDICTION

10.    Plaintiffs bring this putative class action pursuant to 42 U.S.C. § 1983 for relief from both detention and conditions of confinement that violate their Fourteenth Amendment right under the U.S. Constitution and pursuant to 42 U.S.C. § 12131 *et seq.* for relief from disability discrimination.

11.    This Court has jurisdiction pursuant to 42 U.S.C. § 1983; 28 U.S.C. § 1331; 28 U.S.C. § 2201; and 28 U.S.C. § 2202.  A substantial, actual, and continuing controversy exists between the parties.

## VENUE & INTRADISTRICT ASSIGNMENT

12.    Venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(b)(2).

13.    Defendants operate DSH-Patton, which is located in the Central District of California, and the events or omissions giving rise to this action arose in San Bernardino

*unacceptable,'* L.A. TIMES, Jun. 26, 2020, https://www.latimes.com/california/story/2020-06-26/san-quentin-state-prison-coronavirus-cases-soar.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

County, which is located within the Central District of California.  Plaintiffs also reside at DSH-Patton in San Bernardino County.

14.    This action should be assigned to the Eastern Division of the Central District of California pursuant to General Order No. 19-03 § I.B.1.a(1)(c).  All Plaintiffs reside in in the Eastern Division, and Defendants operate DSH-Patton, which is located in the Eastern Division.

## PARTIES

### *Plaintiff Richard Hart*

15.    Plaintiff Richard Hart ("Mr. Hart") is a 66-year-old lung cancer survivor who lost part of his left lung when receiving cancer treatment last year.  Mr. Hart also has Chronic Obstructive Pulmonary Disease ("COPD") and hypertension, and is obese with a body mass index of 33.

16.    According to CDC guidance, Mr. Hart's age and medical conditions place him at a heightened risk of severe illness or death due to COVID-19.  In addition, Mr. Hart is an individual with a disability as defined by the ADA.  *See* 42 U.S.C. § 12102(2)(b).

17.    Defendants are holding Mr. Hart because a court found him to be not guilty by reason of insanity under Penal Code section 1026 for criminal acts that occurred twenty-two years ago.  Mr. Hart's actions did not result in any bodily harm.  According to recent reports, his risk of future violence is "low" based on Mr. Hart's improved insight and coping skills, and he is close to completing his treatment goals.

18.    The primary purpose of Mr. Hart's continued confinement at DSH-Patton is to receive treatment for his mental health disability.  However, managing his condition requires only minimal psychiatric treatment at DSH-Patton, and this treatment could be replicated in another setting without difficulty.  In particular, Mr. Hart takes medication and sees a therapist two times per month.  Prior to the COVID-19 outbreak, Mr. Hart also attended group programming sessions, which Defendants have cancelled due to the

outbreak.

19.     On July 17, 2020, Plaintiffs' counsel sent a formal request to Defendants to evaluate Mr. Hart, on an expedited basis, for transfer or discharge from DSH-Patton to a safer setting in light of Mr. Hart's high risk for becoming severely ill or dying from COVID-19.  To date, Defendants have continued to hold him at the facility under the same conditions as existed before the outbreak—with the exception of the indefinite suspension of his group programming.  Defendants have refused to transfer or discharge Mr. Hart despite the fact that his own treatment team at DSH-Patton already recommended him for community outpatient treatment on February 4, 2020.

20.     If Defendants were to discharge Mr. Hart from DSH-Patton, he could continue therapy and medication in a safer, non-congregate community setting that would not jeopardize his life.  Mr. Hart has a supportive family who have offered to assist him in his reentry into the community.  He also has income to pay for a place to live independently, and would continue to receive medical and psychiatric services and follow any appropriate conditions for ongoing supervision.

21.     Mr. Hart fears for his well-being because of the COVID-19 outbreak at DSH-Patton and is experiencing stress and anxiety.  He believes that, if he were to contract COVID-19, he "would have a slim chance of survival."

### *Plaintiff Ervin Longstreet*

22.     Plaintiff Ervin Longstreet ("Mr. Longstreet") is a Navy veteran and cancer survivor with multiple medical conditions, including hypertension and kidney and liver conditions that require medication.  He has been told by his doctors that he likely will require dialysis in the near future and may need an organ transplant.

23.     According to CDC guidance, Mr. Longstreet's medical conditions place him at heightened risk of severe illness or death due to COVID-19.  In addition, Mr. Longstreet is an individual with a disability as defined by the ADA.  *See* 42 U.S.C. § 12102(2)(b).

24.     Defendants are holding Mr. Longstreet at DSH-Patton because a court found him to be not guilty by reason of insanity under Penal Code section 1026 for criminal acts that occurred in 2007.  According to recent reports, his risk for future violence is "low," and he is stable on his medications.

25.     Mr. Longstreet is currently receiving extremely minimal psychiatric treatment at DSH-Patton.  In particular, Mr. Longstreet takes medication and sees a therapist approximately two times per month.  Prior to the COVID-19 outbreak, Mr. Longstreet also attended group programming sessions, which Defendants have cancelled due to the outbreak.

26.     On June 18, 2020, Plaintiffs' counsel sent a formal request to DSH to evaluate Mr. Longstreet, on an expedited basis, for transfer or discharge from DSH-Patton to a safer setting in light of the COVID-19 risks at the facility.  In addition to Mr. Longstreet's risk of becoming severely ill or dying from COVID-19, there are a number of factors that indicate he can be discharged safely.  For example, Mr. Longstreet has extensive family support, including a brother, a daughter, and the mother of his children.  Mr. Longstreet's family members have expressed their willingness to assist with his reentry into the community, including providing him housing in a non-congregate setting.  Mr. Longstreet works in the DSH-Patton barber shop and has been told he could find work in the field after discharge.

27.     On July 3, 2020, Defendants informed Plaintiffs' counsel that "Mr. Longstreet has demonstrated progress towards several of the areas identified in his discharge plan, including increased engagement in treatment."  DSH evaluators concluded that he was appropriate for immediate transfer to Sylmar Health & Rehabilitation Center, another facility that is smaller than DSH-Patton though is still a congregate setting that has had COVID-19 cases.  On July 15, 2020, Sylmar notified DSH that Mr. Longstreet would not be admitted to Sylmar at the present time, to allow for "additional time at DSH-P[atton] to develop a more detailed timeline of events related

to his mental illness" and for DSH to complete a "medication evaluation."

28.    To date, Defendants have not taken any action to complete these recommendations, and have not taken any other steps to facilitate Mr. Longstreet's transfer to a more appropriate non-congregate setting that does not pose the same COVID-19 risks.  Instead, Defendants continue to hold Mr. Longstreet at DSH-Patton.  In addition, Mr. Longstreet has had other medical problems for which he has not been able to see necessary medical specialists due to COVID-19-related restrictions in place at DSH-Patton.

29.    Mr. Longstreet experiences extreme stress and anxiety due to the outbreak at DSH-Patton, and he fears for his well-being.  In Mr. Longstreet's words, "this is turning into a life sentence, and I wasn't even sentenced to life."

### *Plaintiff Aldo Hernandez*

30.    Plaintiff Aldo Hernandez ("Mr. Hernandez") has been diagnosed with coronary artery disease and type 2 diabetes.  He is also obese, with a body mass index of 38.1.

31.    According to CDC guidance, Mr. Hernandez's medical conditions place him at heightened risk of severe illness or death due to COVID-19.  In addition, Mr. Hernandez is an individual with a disability as defined by the ADA.  *See* 42 U.S.C. § 12102(2)(b).

32.    Defendants are holding Mr. Hernandez at DSH-Patton because a court found him to be not guilty by reason of insanity under Penal Code section 1026 for criminal acts that occurred twenty-five years ago.

33.    The primary purpose of Mr. Hernandez's continued confinement at DSH-Patton is to receive treatment for his mental health disability.  However, managing his condition requires only minimal psychiatric treatment at DSH-Patton, and this treatment could be replicated in another setting without difficulty.  Specifically, Mr. Hernandez takes medication and sees a social worker four times per month.  Prior to the COVID-19

outbreak, Mr. Hernandez also attended group programming sessions, which Defendants have cancelled due to the outbreak.

34.     Upon information and belief, since the onset of the pandemic, Defendants have failed to assess Mr. Hernandez for discharge or transfer despite his high risk of becoming severely ill or dying if he contracts COVID-19.

35.     If DSH were to conduct such an evaluation, it would be apparent that Mr. Hernandez could continue effective therapy and medication in a non-congregate community setting outside of DSH-Patton, where he would not face the heightened risk of contracting the virus.  Mr. Hernandez has a supportive family, with whom he is in regular contact by phone and mail, who could also assist with his reentry and participation in ongoing treatment.  A recent report noted that he is "psychiatrically stable" and that his symptoms are controlled on medications.

36.     Mr. Hernandez is very afraid.  He notes: "It is very scary to be stuck in a place where you don't know the outcome and can't see your family.  All you can do is hope and pray that you don't catch it."

### Plaintiff Charles Gluck

37.     Plaintiff Charles Gluck ("Mr. Gluck") has diagnoses of type 2 diabetes and hypertension.  He is also obese, with a body mass index of 32.

38.     According to CDC guidance, Mr. Gluck's medical conditions place him at heightened risk of severe illness or death due to COVID-19.  In addition, Mr. Gluck is an individual with a disability as defined by the ADA.  *See* 42 U.S.C. § 12102(2)(b).

39.     Defendants are holding Mr. Gluck at DSH-Patton because a court found him to be not guilty by reason of insanity under Penal Code section 1026 for criminal acts that occurred in 1985.

40.     The primary purpose of Mr. Gluck's continued confinement at DSH-Patton is to receive treatment for his mental health disability.  However, managing his condition requires only minimal psychiatric treatment at DSH-Patton, and this treatment could be

replicated in another setting without difficulty.  Specifically, Mr. Gluck takes medication and sees a therapist two times per month.  Prior to the COVID-19 outbreak, Mr. Gluck also attended group programming sessions, which Defendants have cancelled due to the outbreak.

41.     Upon information and belief, since the onset of the pandemic, Defendants have failed to assess Mr. Gluck for discharge or transfer despite his high risk of becoming severely ill or dying if he contracts COVID-19.

42.     If Defendants were to conduct such an evaluation, it would be apparent that, as noted in his most recent court report, Mr. Gluck's risk of serious harm or imminent violence is "low."  Mr. Gluck's primary behavioral health needs include substance abuse treatment.  If he were released or transferred to a safer setting, Mr. Gluck would be willing to participate in such treatment.  If discharged from DSH, Mr. Gluck would also be eligible to receive SSDI benefits.

43.     In Mr. Gluck's words: "I feel very uncomfortable because we don't know where we stand.  I feel so bottled up, like a rat trapped in a cage."

### Plaintiff Graham Waldrop

44.     Plaintiff Graham Waldrop ("Mr. Waldrop") has type 2 diabetes and is severely obese, with a body mass index of 57.8.  He also has a diagnosis of obstructive sleep apnea, for which he needs to use a continuous positive airway pressure ("CPAP") machine, which requires daily cleaning.

45.     According to CDC guidance, Mr. Waldrop's medical and physical conditions place him at greatly heightened risk of severe illness or death due to COVID-19.  In addition, Mr. Waldrop is an individual with a disability as defined by the ADA.  *See* 42 U.S.C. § 12102(2)(b).

46.     Defendants are holding Mr. Waldrop at DSH-Patton because a court found him to be not guilty by reason of insanity under Penal Code section 1026 for criminal acts that occurred in 2007.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

47.     The primary reason for Mr. Waldrop's continued confinement at DSH-Patton is to receive treatment for his mental health disability.  However, managing his condition requires only minimal psychiatric treatment at DSH-Patton, and this treatment could be replicated in another setting without difficulty.  Specifically, he takes medication and does not receive any individual therapy.  Before being cancelled as a result of the COVID-19 pandemic, Mr. Waldrop participated in group programming at DSH-Patton.

48.     Upon information and belief, since the onset of the pandemic, Defendants have failed to assess Mr. Waldrop for discharge or transfer despite his high risk of becoming severely ill or dying if he contracts COVID-19.

49.     If Defendants were to conduct such an assessment, it would be apparent that Mr. Waldrop is able to continue medication in a non-congregate community setting outside of DSH, where he would not face a heightened risk of contracting the virus.  Mr. Waldrop has a supportive family, with whom he is in regular contact by phone, who can provide him housing and assist with his reentry and participate in ongoing treatment if he is released from DSH-Patton.

50.     Mr. Waldrop is afraid to stay at DSH-Patton because he knows that his health conditions put him at high risk if he contracts COVID-19.  He is constantly worried about his health and states that he is "afraid to die here."

### *Defendants*

51.     Defendant Stephanie Clendenin ("Clendenin") is the Director of the California Department of State Hospitals ("DSH").  She is sued herein in her official capacity only.  As DSH Director, Defendant Clendenin oversees the management of California's state hospital system, including California's five state hospitals: DSH-Atascadero, DSH-Coalinga, DSH-Metropolitan, DSH-Napa, and DSH-Patton.

52.     Defendant Janine Wallace ("Wallace") is the Executive Director of DSH-Patton.  She is sued herein in her official capacity only.  Defendant Wallace oversees the

management of DSH-Patton and exercises the day-to-day control over its residents' custody.

53.     Defendants are responsible for the health and safety of DSH-Patton patients and with ensuring that they are served in accordance with federal and state law.

## FACTUAL BACKGROUND

**A.     COVID-19 Poses a Grave Risk of Harm.**

54.     COVID-19 is a novel communicable virus that has proved unusually fatal. As of August 4, 2020, more than 4.7 million people in the United States have contracted the coronavirus and at least 155,000 have died.[2]  In recent days, the number of reported cases of infection in many parts of the country, including in California, have shown a frightening increase, and numerous media outlets and public officials expect that the reported number of deaths will increase significantly as well.  Far from being over, many epidemiologists are predicting that the pandemic will only worsen in the fall.

55.     Some individuals have a higher risk of severe illness from COVID-19, according to the CDC.  In particular, the risk of severe illness or death from COVID-19 increases with age, with a large increase in risk starting at age 50.[3]

56.     According to the CDC, individuals of any age with the following underlying conditions are also at increased risk of severe illness from COVID-19: cancer; chronic kidney disease; COPD; serious heart conditions such as heart failure, coronary artery disease, or cardiomyopathies; type 2 diabetes; sickle cell disease; immunocompromised state from a solid organ transplant; and obesity (body mass index of 30 or higher).[4]

---

[2]  *Cases and Deaths in the U.S.*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Aug. 4, 2020).

[3] *People at Increased Risk of Severe Illness - Older Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated July 30, 2020).

[4] *People at Increased Risk of Severe Illness - People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

57.     In addition, the CDC states that individuals of any age with the following underlying conditions might be at an increased risk for severe illness from COVID-19: asthma; cerebrovascular diseases; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions such as dementia; liver diseases; pregnancy; pulmonary fibrosis; thalassemia; type 1 diabetes; and individuals who are smokers.[5]

58.     For people in the highest risk populations, such as Plaintiffs and the class of people they seek to represent, the United States fatality rate of COVID-19 infection is staggering: almost 20%.[6]  Further, although the long-term effects of COVID-19 are not yet well-known, people who contract but do not die from COVID-19 may still have serious lifelong consequences, including lung damage, blood clots, and heart problems.

59.     Many people in higher risk categories will develop severe symptoms and will need advanced medical care.  This level of supportive care requires highly specialized equipment that is in limited supply, like ventilators, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.

**B.     COVID-19 Poses a Heightened Risk of Harm to Individuals Detained in Locked Psychiatric Facilities such as DSH-Patton.**

60.     DSH-Patton is a locked psychiatric facility that provides treatment to patients with an objective of preparing them for safe discharge and reintegration into the community.  Since the onset of the pandemic, locked facilities have been an epicenter of coronavirus transmission, and psychiatric facilities such as DSH-Patton are uniquely

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated July 30, 2020).

[5] *Id.*

[6] Erin K. Stokes, et al., *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020,* MORBIDITY AND MORTALITY WEEKLY REPORT, https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm (last updated June 18, 2020).

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

vulnerable to COVID-19 outbreaks.

61.     Over the past few months, COVID-19 has spread through psychiatric hospitals across the country.[7]  By April 17, 2020, there were already more than 1,450 COVID-19 cases reported at state mental health facilities in twenty-three states and Washington, D.C.  At the Eastern Louisiana Mental Health System, a locked psychiatric facility, more than 20% of patients tested positive and six died by May 13, 2020.  At Tewksbury Hospital, a psychiatric hospital in Massachusetts, 55% of the more 300 patients tested positive for the virus by June 22, 2020.  In New York, at least thirty COVID-related deaths have occurred in state psychiatric facilities.

62.     According to the CDC and other public health experts, the only known effective measures to reduce the risk for vulnerable people like Plaintiffs and the class they seek to represent are to prevent them from being infected in the first place and to limit community spread.  The CDC recommends maintaining a minimum of six feet

---

[7] *See* Danny Hakim, *'They Want to Forget Us': Psychiatric Hospital Workers Feel Exposed*, N.Y. TIMES, April 27, 2020, https://www.nytimes.com/2020/04/24/nyregion/coronavirus-new-york-psychiatric-hospitals.html; Terrence T. McDonald, *Coronavirus cases at NJ psych hospitals climb to 563, with 9 deaths*, BURLINGTON COUNTY TIMES, May 1, 2020, https://www.burlingtoncountytimes.com/news/20200501/coronavirus-cases-at-nj-psych-hospitals-climb-to-563-with-9-deaths; Elly Belle, *We Can't Forget About Psychiatric Hospitals During the COVID-19 Outbreak*, HEALTHLINE, June 30, 2020, https://www.healthline.com/health/mental-health/psychiatric-hospitals-during-covid-19; Nada Hassanein, *'I don't want to die': Almost Three Dozen Coronavirus Cases Now at Florida State Hospital*, TALLAHASSEE DEMOCRAT, July 22, 2020, https://www.tallahassee.com/story/news/2020/07/22/almost-three-dozen-coronavirus-cases-now-florida-state-hospital/5485504002/; Kristine de Leon, *Montana State Hospital Reports Two Patients Tested Positive for COVID-19*, MONTANA STANDARD, July 22, 2020, https://mtstandard.com/news/local/montana-state-hospital-reports-two-patients-tested-positive-for-covid-19/article_170a86e3-80c1-5ce0-99a5-8edeb1b82a79.html; Luanne Rife, *COVID Outbreaks at Virginia's Psychiatric Hospitals Kill 5, Infect Dozens*, THE ROANOKE TIMES, July 29, 2020, https://roanoke.com/news/local/covid-outbreaks-at-virginias-psychiatric-hospitals-kill-5-infect-dozens/article_0b71b8dd-c440-5005-b467-d60ba388b0cf.html.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

between people at all times, reducing frequency of contact, and maintaining rigorous personal hygiene, including frequently and thoroughly washing hands with soap and water.

63.    Infection control and social distancing is particularly difficult in psychiatric facilities, however, because such facilities are designed to *encourage* social interaction through shared living spaces, providing meals in communal settings, and group programming.  Unlike traditional medical hospitals, psychiatric hospitals are simply not designed to resist the spread of viral infection.[8]

64.    Once COVID-19 enters a psychiatric facility, the results can be disastrous. As one infectious disease expert explained, "[i]t's the worst of all worlds . . . You get one case in these [psychiatric] institutions, and you've got 10 in the next few days.  These are almost invariably very high-risk patients.  They're elderly, they have chronic medical conditions, they're on medications.  It's a mess."[9]

65.    In light of the "substantial risk of coronavirus spread with congregation of individuals in a limited space such as in an inpatient or residential [mental health] facility," the federal Substance Abuse and Mental Health Services Administration ("SAMHSA") has advised "that outpatient treatment options, when clinically appropriate, be used to the greatest extent possible."[10]

_____

[8] Masha Gessen, *Why Psychiatric Wards are Uniquely Vulnerable to the Coronavirus*, THE NEW YORKER, Apr. 21, 2020, https://www.newyorker.com/news/news-desk/why-psychiatric-wards-are-uniquely-vulnerable-to-the-coronavirus.
[9] Kit Ramgopal, *Coronavirus in a Psychiatric Hospital: 'It's the worst of all worlds,'* NBC NEWS, Apr. 17, 2020, https://www.nbcnews.com/health/mental-health/coronavirus-psychiatric-hospital-it-s-worst-all-worlds-n1184266 (last updated Apr. 27, 2020) (discussing COVID-19 outbreak at Western State Hospital, one of the largest psychiatric institutions in the western United States).
[10] SAMHSA, Considerations for the Care and Treatment of Mental and Substance Use Disorders in the COVID-19 (revised May 7, 2020) https://www.samhsa.gov/sites/default/files/considerations-care-treatment-mental-substance-use-disorders-covid19.pdf; see also Bazelon Center for Mental Health Law, During the Pandemic, States and Localities Must Decrease the Number of Individuals in

**C.    DSH-Patton Is A Cramped, Congregate Setting, Not Designed to Permit Social Distancing or to Foster Infection Control.**

66.    DSH-Patton is one of the largest psychiatric hospitals in the country.  The facility currently operates approximately 1,527 beds in 33 units, and employs approximately 2,380 people.  DSH-Patton patients often stay in the facility for a decade or more, sometimes longer than the time they would have served had they been convicted and served their time in state prison.

67.    Within DSH-Patton, social distancing is virtually impossible.  Defendants hold patients in units with approximately 50 other patients.  Patients share bedrooms, bathrooms, common areas, and telephones, and eat meals in a communal setting.  In some cases, five patients share a bedroom.  In most bedrooms, there is less than six feet of space between each bed.

68.    Many units at DSH-Patton are connected to "sister" units, meaning that 100 patients interact regularly and share common areas.  For example, the "sister" units share a common room where patients from both units watch television, play cards and games, and do art projects.  In addition, patients from the "sister" units line up in the same area for medications.  Patients from different units and part of the facility pass each other with less than six feet of space.

69.    Every day, staff members—which include psychiatrists, psychologists, social workers, rehabilitation therapists, psychiatric technicians, registered nurses, registered dieticians and other clinical and administrative staff— enter and exit the facility and come into close contact with Plaintiffs.  Contrary to DSH protocols, patients report that staff members do not properly wear face coverings, or do not wear face coverings at all, inside the patient areas.

Psychiatric Hospitals, By Reducing Admissions and Accelerating Discharges (Apr. 15, 2020) (urging state hospitals to accelerate discharges and noting that people with serious mental illness tend to have more medical issues than the population at large), http://www.bazelon.org/wp-content/uploads/2020/04/4-15-20-BC-psych-hospitals-statement-FINAL.pdf.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

70.    Upon information and belief, DSH-Patton staff also do not regularly or adequately sanitize tables and chairs in any of the shared spaces on the units, and they do not sanitize the patient phones between each use.

71.    DSH staff themselves have expressed concerns that "[t]here are lapses for the staff members and lapses for patients where there are all these areas that the virus can seep in."[11]  Staff have reported that masks are worn inconsistently, that some staff have been unable to get tested, and that patients sent out for COVID-19 treatment are not retested or quarantined when they return to the facility.[12]

72.    Upon information and belief, DSH-Patton is even less able to maintain infection control if the facility's ventilation system uses recycled air.  Growing research shows that aerosolized particles of COVID-19 can disseminate much further than six feet, and may spread even farther through fans or air conditioners.  Thus, people can become infected by the virus simply by breathing the air, even after a person with the virus has left the area.

73.    Recently, Dr. Katherine Warburton, DSH's Medical Director, stated that DSH is no longer running psychiatric hospitals, but rather running infection treatment.  Dr. Warburton acknowledged that COVID-19 "spreads like wildfire" once it gets into a state hospital.[13]

**D.    DSH-Patton Is in the Midst of a Growing COVID-19 Outbreak.**

74.    Although DSH-Patton avoided the COVID-19 virus for more than two months, once the virus entered the facility it quickly took hold.

---

[11] Lee Romney, *Patients, Staff at State Hospitals Worry Coronavirus Will Wreak Havoc*, KQED NEWS, Apr. 13, 2020, https://www.kqed.org/news/11812116/patients-staff-at-state-hospitals-worry-coronavirus-will-wreak-havoc.
[12] *Id.*
[13] Sarah Dowling, *As State Hospitals Battle Coronavirus, Yolo County Inmates Await Treatment*, WOODLAND DAILY DEMOCRAT, July 19, 2020, https://www.dailydemocrat.com/2020/07/19/as-state-hospitals-battle-coronavirus-yolo-county-inmates-await-treatment/.

75.     On June 1, 2020, DSH-Patton announced that it had four confirmed cases of COVID-19 in its patient population.

76.     Less than three weeks later, on June 17, 2020, the virus spread to at least sixty-three (63) patients and twenty (20) staff.  By June 22, 2020, the number of confirmed cases at DSH-Patton jumped to seventy-six (76).

77.     As of the date of this filing, at least 112 patients at DSH-Patton have tested positive for COVID-19, including individuals who have had contact with Plaintiffs.  Additionally, at least 147 DSH-Patton staff members and onsite on-DSH personnel have tested positive for the virus.  At least two patients have died from COVID-19.

78.     San Bernardino County, where DSH-Patton is located, has the fourth highest total number of COVID-19 cases of all California counties.  San Bernardino County is on the California Department of Public Health ("CDPH") "watchlist," and local health officials have noted that hospitals are reaching "surge capacity" because of an influx of new COVID-19 cases from local facilities, including hospitals.[14]  CDPH has identified DSH-Patton as a "driver" in San Bernardino County's "elevated disease transmission and increasing hospitalizations."[15]

79.     In an effort to address the COVID-19 outbreak at DSH-Patton, Defendants placed at least 15 units, or approximately 650 patients, on isolation or quarantine by June 23, 2020.  Patients on isolation or quarantine do not receive access to a number of services, including recreation, canteen, and specialty medical appointments.  Despite these measures, the numbers of people testing positive at DSH-Patton continue to rise.

80.     Plaintiffs and other patients at DSH-Patton are now stuck in their units,

---

[14] Alex Wigglesworth, *Coronavirus Packs San Bernardino Hospitals; Imperial County Told to Reinstate Stay-at-Home Order*, L.A. TIMES, June 26, 2020, https://www.latimes.com/california/story/2020-06-26/california-coronavirus-cases-surpass-200-000-as-hospitalizations-mount.

[15] *County Data Monitoring*, CAL. DEP'T OF PUB. HEALTH, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CountyMonitoringDataStep2.aspx (last updated July 30, 2020).

living in constant fear for their personal health and safety.  In the words of one patient, people detained there feel like they are "waiting to die."

**E.     COVID-19 Poses a Heightened Risk of Harm, including Severe Illness or Death, to Plaintiffs and the Class They Seek to Represent.**

81.     As set forth above, Plaintiffs and hundreds of other patients at DSH-Patton live with multiple medical conditions that the CDC has identified as significantly increasing their risk of severe illness or death if they contract COVID-19.

82.     Plaintiffs' medical conditions are typical of the patient population at DSH-Patton.  As research has shown, people with mental illness, including patients at DSH-Patton, are more likely than the general population to live with serious medical conditions and chronic disease, including many diseases that have been identified by the CDC as high-risk factors for COVID-19.[16]

83.     For example, Mr. Hart is diagnosed with Chronic Obstructive Pulmonary Disease ("COPD").  COPD has been found to be associated with "substantial severity and mortality rates"[17] and an "over five-fold increased risk of severe COVID-19."[18]  The COVID-19 case fatality rate for individuals with chronic respiratory disease is 2.7 times that of the average infected individual.[19]  Like Mr. Hart, more than 22% of people with serious mental illness have been diagnosed with COPD, or approximately 336 patients at

---

[16] Marc De Hert, et al., *Physical Illness in Patients with Severe Mental Disorders: Prevalence, Impact of Medications and Disparities in Health Care*, 10(1) WORLD PSYCHIATRY 52 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3048500/.

[17] Jaber Alqahtani, et al., *Prevalence, Severity and Mortality associated with COPD and Smoking in patients with COVID-19: A Rapid Systematic Review and Meta-Analysis*, PLOS ONE, May 11, 2020, https://doi.org/10.1371/journal.pone.0233147.

[18] Giuseppe Lippi, et al., *Chronic Obstructive Pulmonary Disease is Associated with Severe Coronavirus Disease 2019 (COVID-19)*, 167 RESPIRATORY MEDICINE (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7154502/.

[19] Beth Sissons, *How Does COVID-19 Affect COPD?* MEDICAL NEWS TODAY, https://www.medicalnewstoday.com/articles/covid-19-and-copd (last updated May 19, 2020).

DSH-Patton.[20]

84.     Mr. Longstreet, Mr. Gluck, and Mr. Hart have hypertension, which the CDC has identified as a risk factor for increased COVID-19 severity.  Hypertension has been identified as a "leading factor" in COVID-19-related deaths.[21]  In fact, research has shown that people with hypertension may be as much as twice as likely to die from COVID-19.  Approximately 51% of patients with serious mental illness, or around 779 patients in DSH-Patton, have hypertension.[22]

85.     Patients at DSH-Patton are also more likely than the general population to be obese and to have obesity-related medical conditions, such as type 2 diabetes and cardiovascular disease.[23]  Approximately 52% of people with serious mental illness are obese,[24] and more than 28% have type 2 diabetes, which is more than double the rate of the general population.[25]  Based on the total population at DSH-Patton, these percentages translate to approximately 794 patients who are obese, and 428 patients with type 2 diabetes, respectively.  Mr. Waldrop and Mr. Hernandez have type 2 diabetes and severe obesity.

---

[20] Seth Himelhoch, et al., *Prevalence of Chronic Obstructive Pulmonary Disease Among Those with Serious Mental Illness*, 161 AM. J. PSYCHIATRY 2317 (2004), https://ajp.psychiatryonline.org/doi/full/10.1176/appi.ajp.161.12.2317.

[21] Tarryn Mento, *Hypertension Continues to Be Top Underlying Health Condition Among Local COVID-19 Deaths*, KPBS NEWS, May 30, 2020, https://www.kpbs.org/news/2020/may/30/more-half-san-diegans-who-died-covid-19-had-high-b/.

[22] Christoph U. Correll, et al. *Findings of a U.S. National Cardiometabolic Screening Program Among 10,084 Psychiatric Outpatients*, 61(9) PSYCHIATRIC SERVICES 892 (2010), https://pubmed.ncbi.nlm.nih.gov/20810587/.

[23] Tim Bradshaw and Hilary Mairs, *Obesity and Serious Mental Ill Health: A Critical Review of the Literature*, 2(2) HEALTHCARE 166 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4934464/.

[24] Correll, *supra* note 22.

[25] Christina V. Mangurian, et al., *Diabetes and Prediabetes Prevalence by Race and Ethnicity Among People with Severe Mental Illness*, DIABETES CARE, May 2018, https://care.diabetesjournals.org/content/early/2018/05/14/dc18-0425.

86.     The CDC has identified type 2 diabetes and obesity as risk factors for severe COVID-19 illness.  Research has shown the mortality rate of COVID-19 patients with diabetes to be approximately three times the general rate.[26]  The CDC has also found that obesity, defined as a body mass index ("BMI") of over 30, increases an individual's risk for severe illness.  Research has shown that the need for mechanical ventilation because of COVID-19 increases with BMI, with individuals with a BMI over 35 seven times more likely to need the intervention.[27]  Mr. Hernandez's BMI is 38.1.  Mr. Waldrop's BMI is 57.8.

87.     DSH-Patton patients also have other risk factors, including those related to age, that increase the likelihood of severe complications from COVID-19.  Approximately 12% of the DSH patient population, including Mr. Hart, is over the age of 65.  Approximately 80% of the deaths in the United States have been among individuals ages 65 and older.  The CDC has recognized that the risk of severe illness from the virus increases with age, with a significant increase in risk starting at age 50.  Almost one quarter of DSH patients are over 50 years old.

88.     The CDC has also reported that people from certain racial and ethnic groups are "at increased risk of getting sick and dying from COVID-19."[28]  Recent data from the CDC shows that the age-adjusted COVID-19 death rate for Black people is 3.6 times greater than that for white people.[29]  The CDC also found that Black and Hispanic

---

[26] Sten Madsbad, *COVID-19 Infection in People with Diabetes*, TOUCH ENDOCRINOLOGY, https://www.touchendocrinology.com/insight/covid-19-infection-in-people-with-diabetes/ (last visited August 3, 2020).

[27] Arthur Simonnet, et al., *High Prevalence of Obesity in Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) Requiring Invasive Mechanical Ventilation*, 28(7) OBESITY 1195 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7262326/.

[28] *Health Equity Considerations and Racial and Ethnic Minority Groups*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last updated July 24, 2020).

[29] Tiffany Ford, et al., *Race Gaps in COVID-19 Deaths are Even Bigger than They Appear*, BROOKINGS INSTITUTION, June 16, 2020, https://www.brookings.edu/blog/up-front/2020/06/16/race-gaps-in-covid-19-deaths-are-even-bigger-than-they-appear/.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Americans under age 65 die from COVID-19 at significantly higher rates than white patients.[30]  Approximately twenty six percent (26%) of DSH patients, including Mr. Longstreet, are Black.  Twenty-four percent (24%), including Mr. Hernandez, are Hispanic.

89.    Plaintiffs and the class of people they represent all live in significant fear that they will face severe illness or death from contracting COVID-19 at DSH-Patton.

**F.    Defendants Have Failed to Protect Plaintiffs and the Plaintiff Class in the Face of the Grave Risk Posed by DSH-Patton's COVID-19 Outbreak.**

90.    On March 21, 2020, Governor Newsom issued Executive Order N-35-20, which granted Defendant Clendenin additional emergency powers to "waiv[e] any provision or requirement of the Welfare and Institutions Code … [and] any provision or requirement of the Penal Code that affects the execution of laws relating to care, custody, and treatment of persons with mental illness committed to or in the custody of" DSH in order to "protect the health, safety and welfare of patients" committed to DSH's care during the COVID-19 pandemic.  Exec. Order N-35-20(5).

91.    In a letter on April 20, 2020, Plaintiffs' legal counsel at Disability Rights California, along with the California Public Defenders Association, the ACLU of Northern California, and California Attorneys for Criminal Justice, called on Defendants to assess all DSH residents and release high-risk patients in light of the heightened danger of COVID-19.  Advocates also called on Defendants to reduce DSH's overall population to allow for social distancing.

92.    On May 20, 2020, Disability Rights California sent a letter to Defendants offering input on ways that DSH may exercise its authority to facilitate patient discharges or transfers to safer settings.  *See, e.g.* Exec. Order N-35-20; Welf. & Inst. Code §§ 4146,

---

[30] Jonathan M. Wortham, et al., *Characteristics of Persons Who Died with COVID-19 – United States, February 12-May 18, 2020,* MORBIDITY AND MORTALITY WEEKLY REP., https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e1.htm (last updated July 17, 2020).

7250, Penal Code §§1603-04.

93.    To this day, Defendants have not taken steps to meaningfully reduce the population at DSH-Patton to allow for greater social distancing, and have failed to exercise their authority under the Executive Order and their traditional powers to protect high-risk patients from COVID-19.  Indeed, Defendants initially utilized the authority under the Executive Order to *suspend* discharges, refusing to release eligible patients from DSH facilities to the community, even though some patients were ready for discharge and had court orders for release.

94.    Defendants did initially suspend most admissions to DSH facilities to limit the introduction of the virus.  Unfortunately, this response left hundreds of people in county jails without access to care, and Defendants restarted admissions.  Over the period that Defendants suspended admissions, the waitlist of people needing a bed in their facilities almost doubled.

95.    Defendants' primary response to the pandemic within DSH-Patton has been to limit programming, including most therapeutic groups and classes.  Defendants' other response has been to "lock-down" or quarantine whole units of patients when there is a single positive test.  Although patients on a quarantined unit cannot interact with patients in outside units, they still mingle with one another within a unit, using the same bathrooms and telephones, allowing the virus to continue to spread.

96.    Ultimately, Defendants' efforts to limit the spread of COVID-19 at DSH-Patton have not proved effective.  The number of people testing positive for COVID-19 at DSH-Patton continues to rise.  Defendants continue to detain Plaintiffs and the class members they seek to represent at DSH-Patton, putting them at grave risk of severe illness or death.

## CLASS ACTION ALLEGATIONS

97.    Plaintiffs bring this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

98.     Plaintiffs seek to represent a class consisting of:

All individuals who are currently confined at DSH-Patton or will be confined in the future during the COVID-19 pandemic and who, pursuant to CDC guidelines, are or might be at high risk of becoming severely ill or dying from complications related to COVID-19 (the "Class").

99.     This Class is so numerous that joinder of all members in one action is impracticable.  Defendants confine over 1,500 people at DSH-Patton, and a disproportionately high number of DSH-Patton patients have conditions identified by the CDC as risk factors for COVID-19 complications.[31]  Based on the prevalence of several of CDC risk factors in the population of people with serious mental illness, at least half of the patients at DSH-Patton, or approximately 764 people, are likely in the Class.  Further, because the population changes on a daily basis, it is inherently fluid and the Class includes future members whose names are not known at this time.

100.     Common questions of law and fact apply to all Class members.  These common questions of fact and law include but are not limited to: (1) whether Defendants are holding significant numbers of patients who have conditions that, per the CDC, put them at high risk for severe illness or death if they contract COVID-19; (2) whether COVID-19 is spreading throughout DSH-Patton; (3) whether Defendants have implemented adequate emergency measures during the COVID-19 crisis to protect DSH-Patton residents from substantial risk of serious harm and death, including by expeditiously (a) identifying all individuals at high risk for severe illness due to COVID-19; (b) implementing a process for assessing transfer or discharge options that adequately account for the risk of severe illness due to COVID-19; (c) modifying their policies and practices to accommodate people with disabilities that put them at risk of severe illness due to COVID-19; and (d) identifying and utilizing safe, non-congregate, community

---

[31] *See* Marc De Hert, et al., *supra* note 16; Tim Bradshaw and Hilary Mairs, *Obesity and Serious Mental Ill Health: A Critical Review of the Literature*, 2(2) HEALTHCARE 166 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4934464/.

placements for individuals at risk of severe illness due to COVID-19; (4) whether continuing to detain Class members with high risk factors for COVID-19 in the current conditions at DSH-Patton violates the Due Process Clause of the U.S. Constitution because the conditions of confinement subject Class members to an unreasonable risk of serious harm; (5) whether Defendants' actions and omissions violate the ADA.

101.   Defendants' practices and the claims alleged herein are common to all members of the Class.

102.   Plaintiffs' claims are typical of those of the Class.  Plaintiffs, like all other patients confined at DSH-Patton, are currently being held in conditions that put them at substantial risk of serious harm.  Plaintiffs, like other members of the Class, have underlying conditions that enhance their risk of severe illness or death from COVID-19.

103.   The legal theories on which Plaintiffs rely are the same or similar to those on which all Class members would rely, and the harms suffered by them are typical of those suffered by all other Class members.  Absent class certification, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards for Defendants.

104.   Plaintiffs will fairly and adequately protect the interests of the Class; the interests of the Class representatives are consistent with those of the Class members.  In addition, counsel for Plaintiffs are experienced in class action and civil rights litigation.

105.   Counsel for Plaintiffs know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

## **LEGAL FRAMEWORK AND ALLEGATIONS**

106.   The Court has authority to order appropriate relief to protect Plaintiffs and the class they seek to represent from the dangers posed by COVID-19 under the Fourteenth Amendment and the ADA.

**A.     This Court Has Authority to Order Appropriate Relief to Vindicate Plaintiffs' and Class Members' Fourteenth Amendment Rights, and Such Relief Is Appropriate Here.**

107.   The Due Process Clause of the Fourteenth Amendment requires Defendants to provide Plaintiffs conditions of confinement and services necessary to ensure their reasonable safety.  *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982).   The United States Supreme Court has held that state agencies cannot "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Conditions of confinement that are inadequate to ensure a patient's safety and well-being are improper, regardless of whether the state deliberately created those conditions. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1120-21 (9th Cir. 2003) (holding that civil detainees are not required to satisfy heightened "deliberate indifference" standard of liability); *King v. County of Los Angeles*, 885 F.3d 548, 556-57 (9th Cir. 2018) (same).

108.   The Court has authority to order broad relief, including Plaintiffs' release or transfer, to ensure that Plaintiffs' constitutional rights are protected.  *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) (amended) ("Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights.").

109.   Recently, courts have exercised this authority to remedy constitutional violations due to the dangers posed by COVID-19 infections inside locked facilities.  *See, e.g.*, *Fraihat v. U.S. Immigration and Customs Enforcement*, No. 19-1546, 2020 WL 1932570, at *21, *28 (C.D. Cal. Apr. 20, 2020) (granting nationwide preliminary injunction requiring ICE to identify high-risk detainees and implement measures for their protection from COVID-19, including through release); *Torres v. Milusnic*, No. 20-4450, 2020 WL 4197285, at *23-24 (C.D. Cal. July 14, 2020) (requiring Bureau of Prisons to exercise powers granted under CARES Act to identify high-risk detainees and evaluate them for release to home confinement); *see also Castillo v. Barr*, No. 20-00605, 2020 WL 1502864, at *5-6 (C.D. Cal. Mar. 27, 2020) (ordering release of high-risk immigration detainees due to dangers posed by COVID-19 inside facility); *Ortuño v.*

*Jennings*, No. 20-02064, 2020 WL 1701724, at \*4 (N.D. Cal. Apr. 8, 2020) (same); *cf.*
*Xochihua-Jaimes v. Barr*, 962 F.3d 1065, 1066 (9th Cir. 2020) (sua sponte ordering that
petitioner "be immediately released from detention" due to the "rapidly escalating public
health crisis" caused by COVID-19).

110.   These issues are also currently being litigated in lawsuits involving the rights
and safety of patients in psychiatric facilities who are at high risk related to COVID-19.
*See, e.g.*, *Wilkes v. Lamont*, Case No. 20-594 (D. Conn. filed Apr. 30, 2020); *Doe v.*
*Mikula*, Case No. 2084-1407 (Mass. Sup. Ct., Suffolk Cnty. filed July 1, 2020).

111.   In the face of the threat from COVID-19, social distancing and hygiene
measures are Plaintiffs' only defense.  As the rapidly escalating outbreak at DSH-Patton
shows, those protective measures are exceedingly difficult, if not impossible, to achieve
in the congregate, dense living environment of DSH-Patton, even in the face of
Defendants' attempts to limit the spread.  Plaintiffs and the class they seek to represent
share bedrooms, toilets, sinks, showers, and telephones, eat in communal spaces, and are
in close and constant contact with other detainees and staff that rotate in and out of the
facility.  These conditions pose an unacceptably high risk of infection and, as a result,
Plaintiffs and the proposed class face substantial risk of serious harm from continued
detention in this setting.

**B.     The ADA Requires Defendants to Make Disability-Related Reasonable**
**Modifications to Protect Plaintiffs and Class Members from COVID-19.**

112.   Title II of the ADA provides that "no qualified individual with a disability
shall, by reason of such disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public entity, or be subjected to
discrimination by any such entity."  42 U.S.C. § 12132.

113.   In addition, the ADA requires that all covered entities provide reasonable
modifications in their policies, practices, and procedures in order to give people with
disabilities an equal opportunity to benefit from the entity's programs, services, and
activities.  28 C.F.R. § 35.130 (b)(7).

114.   The ADA also prohibits public entities from utilizing criteria or methods of administration that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3).

115.   Plaintiffs are "qualified" for Defendants' programs, services, and activities, which include providing safe, constitutional living conditions during confinement, medical care, rehabilitative services to prepare for reentry into the community, and discharge planning.  *See* 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. pt. 35, app. B ("[T]itle II applies to anything a public entity does.").

116.   Plaintiffs' counsel have requested that Defendants create a systemic emergency plan to protect patients during the COVID-19 pandemic, including by immediately identifying all high-risk patients and implementing a process for transferring as many of those patients as possible to safer, non-congregate settings.  To date, Defendants have failed to develop and implement any such plan.

117.   Defendants have consistently refused requests to accelerate discharge procedures, even for patients who are at or near discharge ready, and have failed to reasonably modify their policies to give due weight to COVID-19 risk factors when evaluating patients for transfer.  For example, Plaintiffs Hart and Longstreet have requested reasonable accommodations to Defendants' discharge planning process in order to facilitate their accelerated discharge or transfer out of the facility to a safer, non-congregate setting.  Defendants have denied their requests.

118.   Even where Defendants agreed to assess a patient for transfer, those assessments have gone nowhere.  For example, Mr. Longstreet, who receives minimal treatment and has nearly completed all of his discharge goals, requested an accelerated process to effectuate his transfer out of DSH-Patton before he contracts COVID-19.  Defendants refused to modify their normal procedures, and only evaluated Mr. Longstreet for transfer to another congregate facility, which ultimately refused to accept

him without a "medication evaluation" from DSH.  Instead of accelerating a medication evaluation or identifying alternative placement options, Defendants simply gave up, refusing to take any further steps to transfer Mr. Longstreet out of DSH-Patton.

119.   Defendants have also failed to make any modifications necessary to ensure that high-risk people with disabilities receive treatment and other services provided by Defendants while being reasonably protected from contracting, and even dying from, COVID-19.

120.   Defendants also utilize methods of administration that discriminate against Plaintiffs and the class they seek to represent.  When making determinations for discharge or transfer, Defendants do not consider the additional risk that COVID-19 causes Plaintiffs because of their disabilities.

121.   Further, Defendants are failing to provide treatment to Plaintiffs and others similarly situated in the "most integrated setting."  Under the ADA, the "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. pt. 35, app. B.  Continued confinement in a psychiatric institution with only other individuals with disabilities, when unnecessary, violates the ADA.  Here, Plaintiffs would be able to receive the same treatment they are currently receiving at DSH-Patton outside of the facility, in locations that do not place them at risk of severe illness or death.

## INJUNCTIVE AND DECLARATORY RELIEF ALLEGATIONS

122.   An actual controversy exists between Plaintiffs and Defendants regarding their respective legal rights and duties.  Defendants' conduct as alleged above has caused and, absent injunctive relief, will cause Plaintiffs irreparable harm.

123.   In the absence of immediate relief, Plaintiffs will continue to be deprived of these rights.  There is no adequate remedy at law for the continuing violations by Defendants of Plaintiffs' constitutional and statutory rights.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of Fourteenth Amendment Due Process Clause**
**Right to Reasonable Safety in Confinement**

**(Fourteenth Amendment; U.S.C. § 1983)**

124.  Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

125.  Defendants violate the Due Process Clause of the Fourteenth Amendment when they subject Plaintiffs and the Class to conditions of confinement that create a substantial risk of serious harm to their safety and health.

126.  Defendants' polices, practices, acts and omissions, including the conditions of confinement in which they are holding Plaintiffs, subject Plaintiffs and the Class to heightened risk of contracting COVID-19, for which there is no vaccine, effective treatment, or cure.  Plaintiffs and Class members cannot take steps to protect themselves from the spread of COVID-19—such as social distancing, hand-washing hygiene, or self-quarantining—and Defendants have not provided adequate protections to guarantee their care and safety.  Defendants are continuing to subject Plaintiffs and the Class to a substantial risk of serious harm by failing to timely: (1) identify individuals who are high risk for severe illness and/or death from COVID-19, (2) evaluate these individuals for discharge or transfer to alternative, non-congregate settings outside of DSH-Patton, (3) take all necessary steps to effectuate the discharge or transfer of these individuals from DSH-Patton, and (4) implement all appropriate measures to protect patients inside DSH-Patton from COVID-19 infection.

127.  Defendants' actions and inaction violate the rights of Plaintiffs and the Class under the Due Process Clause of the Fourteenth Amendment.

128.  There is no reasonable justification for the Defendants' actions.

129.  Plaintiffs and the Class have suffered and will suffer injury as a proximate

result of Defendants' violation of their rights under the Due Process Clause of the Fourteenth Amendment.

130.   Plaintiffs and the Class are entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

## SECOND CLAIM FOR RELIEF
### Violation of Title II of the ADA
### (42 U.S.C. § 12131 *et seq.*, 28 C.F.R. § 35.130)

131.   Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

132.   Plaintiffs are qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendants.  42 U.S.C. § 12102(2)(b); 42 U.S.C. § 12131(2).

133.   DSH is an agency of the State of California and a public entity as defined in 42 U.S.C. § 12131(1).  DSH's agents, directors, and officers are therefore subject to Title II of the ADA.  42 U.S.C. § 12131(1); 42 U.S.C. § 12132.

134.   Defendants have violated the ADA and its implementing regulations by discriminating against Plaintiffs and the Class on the basis of their disabilities, including by:

a. Failing to reasonably modify their policies and practices to allow Plaintiffs to meaningfully participate in Defendants' programs, including their program for discharging or transferring patients to community-based or other alternative settings where they can more safely receive services, 28 C.F.R. § 35.130(b)(7);

b. Utilizing methods of administration that deprive Plaintiffs of equal access to the benefits of the programs and services that Defendants provide to other individuals, 28 C.F.R. § 35.130(b)(3);

c. Failing to administer services, programs, and activities in "the most integrated setting" appropriate to Plaintiffs' needs, 28 C.F.R. § 35.130(d).

135.   These failures have the effect of defeating or substantially undermining participation by Plaintiffs and the Class in Defendants' programs at DSH-Patton. *See* 28 C.F.R. § 35.130(b)(3)(ii).

136.   Providing modifications of Defendants' discharge policies and practices would not fundamentally alter Defendants' programs, services, or activities.

137.   Plaintiffs and the Class have suffered and will suffer injury as a proximate result of Defendants' violation of their rights under the ADA.

138.   Plaintiffs and the Class are entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court take jurisdiction and order the following:

1. Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs and the Class to the unlawful acts and omissions described herein, and issue an injunction to remedy the violations of the Plaintiffs' and the Class's rights, including ordering Defendants to undertake the following:

   a. Identify all members of the Class by utilizing current CDC guidelines on COVID-19 high-risk factors and provide Plaintiffs' counsel such list, updated at least monthly;

   b. Conduct expedited individualized assessments of all members of the Class to effectuate their safe discharge or transfer from DSH-Patton to a safe, non-congregate setting.  In conducting these assessments, Defendants must:

      i. Adequately address each Class member's risk of severe illness or

34

death from contracting COVID-19 at DSH-Patton;

    ii.  Consider the full range of alternative treatment options, including discharge or transfer to a community setting, a family member's home, temporary leave, conditional release, permanent or temporary housing accommodations, tele-medicine, and intensive case management services.  Under no circumstances should an individual be transferred to another congregate setting with a heightened risk for COVID-19 infection;

    iii.  Seek input from the Class member, the Class member's treatment team, family members and others who assist them, and other supportive decision makers as determined by the patient; and

    iv.  Use all powers and procedures available under the law, including under Executive Order N-35-20, to expeditiously transfer or discharge the class members to a safer, non-congregate or less congregate setting;

c.    Provide updates, no less frequently than monthly, to the Court about the discharge or transfer of Class members; and

d.    Take all necessary precautions pursuant to CDC Guidelines and the Constitution to protect from COVID-19 infection any Class members who are not transferred or discharged, and remain in DSH facilities;

2.    Appoint an independent court-appointed monitor(s) or special master(s) to ensure compliance with the Court's order, and provide the monitor(s) with access to units, transfer or discharge discussions, and confidential communication with Class members, to assess and report on (a) the adequacy of Defendants' actions to effectuate safe discharge or transfer of Class members, and (b) the adequacy of conditions, policies, and precautions at DSH-Patton to protect those Class members who remain in detention at

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

the facility;

3. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future absent the Court's continuing jurisdiction;

4. Award Plaintiffs' reasonable attorneys' fees, costs, expenses and disbursements as authorized by law; and

5. Grant further relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

DATED:  August 5, 2020                    Respectfully submitted,

/s/ Samantha Choe
SAMANTHA CHOE (SBN: 252002)
schoe@cov.com
ADDISON THOMPSON* (SBN:330251)
athompson@cov.com
SYLVIA HUANG* (SBN: 313358)
syhuang@cov.com
ANNIE SHI (SBN: 327381)
ashi@cov.com
**Covington & Burling LLP**
415 Mission St., Ste. 5400
San Francisco, CA 94105
Telephone:  (415) 591-6000


/s/ Anne Hadreas
JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 247391)
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)
Kim.Pederson@disabilityrightsca.org
**Disability Rights California**
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone:  (510) 267-1200
Facsimile:   (510) 267-1201

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF