SAMANTHA CHOE (SBN: 252002)
schoe@cov.com
ADDISON THOMPSON* (SBN: 330251)
athompson@cov.com
SYLVIA HUANG (SBN: 313358)
syhuang@cov.com
ANNIE SHI (SBN: 327381)
Covington & Burling LLP
415 Mission St., Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-6000

JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 24739)
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)
Kim.Pederson@disabilityrightsca.org
Disability Rights California
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201

*Attorneys for Plaintiffs*
*\* C.D. California admission application forthcoming*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD HART et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHANIE CLENDENIN, Director of California Department of State Hospitals, in her official capacity et al.,<br><br>Defendants. | Case No. 5:20-cv-1559-JGB-SHK<br><br>**PLAINTIFFS' NOTICE OF *EX PARTE* APPLICATION AND *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM IN SUPPORT**<br><br>Date:      TBD<br>Time:      TBD<br>Judge:    Hon. Jesus G. Bernal<br>Courtroom: 7D |

i

## PLAINTIFFS' NOTICE OF *EX PARTE* APPLICATION AND *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD HEREIN:

**PLEASE TAKE NOTICE** that Plaintiffs Ervin Longstreet, Aldo Hernandez, Charles Gluck, and Graham Waldrop ("Plaintiffs"), individually and on behalf of all others similarly situated, apply, *ex parte*, for a temporary restraining order ("TRO") and an order to show cause ("OSC") re preliminary injunction against Defendants Stephanie Clendenin, in her official capacity as Director of California Department of State Hospitals ("DSH"), and Janine Wallace, in her official capacity as Executive Director of Patton State Hospital ("Defendants"), enjoining Plaintiffs from continuing to violate Plaintiffs' rights under the Fourteenth Amendment Due Process Clause and Title II of the Americans with Disabilities Act ("ADA").

Specifically, Plaintiffs request that the Court issue a TRO and OSC re preliminary injunction in the form of the proposed order submitted concurrently with this *ex parte* application. The *ex parte* application is made pursuant to 17 U.S.C. § 502(a), Federal Rule of Civil Procedure 65, and Local Rule 65.

This *ex parte* application is based upon this Notice, the Memorandum of Points and Authorities, the declarations filed herewith, all accompanying exhibits, the Motion for Class Certification, filed concurrently, all filings in this matter, the Proposed Order, which is being lodged in accordance with Local Rule 7-20, and any and all evidence, argument, or other matters that may be presented at hearing.

The extreme danger that Plaintiffs and the proposed class now face necessitates expedited relief in the form of a TRO and provisional class certification. In the past two weeks, 113 patients have tested positive for COVID-19. Eighty-nine of these patients tested positive for COVID-19 in the last seven days. Three of the named plaintiffs in this lawsuit tested positive for COVID-19 since the status conference on

December 7, 2020. Numerous putative class members have also tested positive for COVID-19 within the last week, and at least 11 DSH-Patton patients have required acute hospitalization due to severe COVID-19 symptoms. Critical action is required now.

This application is made following the conference of counsel pursuant to L.R. 7-3. On December 4, 2020, Plaintiffs' counsel met and conferred telephonically with Defendants' counsel during which they discussed the substance of Plaintiffs' motions for class certification and for expedited relief as either a motion for preliminary injunction or a temporary restraining order. Plaintiffs' counsel informed Defendants that they would determine the type of expedited relief based on the severity of the COVID-19 outbreak at DSH-Patton, and that Plaintiffs intended to file the applications on December 14.

On December 10, 2020, Plaintiffs' counsel informed Defendants' counsel through an email that, based on an increase of more than 100 cases in the past two weeks, including three of the named Plaintiffs, Plaintiffs intend to move for a temporary restraining order.

On both occasions, Plaintiffs' counsel communicated with Lisa Tillman, Deputy Attorney General, representing the Defendants. Plaintiffs understand that Defendants oppose the application.

DATED: December 14, 2020                    Respectfully submitted,

By:   */s/ Anne Hadreas*
JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 247391)
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC
RE: PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kim.Pederson@disabilityrightsca.org
**Disability Rights California**
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200


By:    */s/ Samantha Choe*
SAMANTHA CHOE (SBN: 252002)
schoe@cov.com
ADDISON THOMPSON* (SBN: 330251)
athompson@cov.com
SYLVIA HUANG (SBN: 313358)
syhuang@cov.com
ANNIE SHI (SBN: 327381)
ashi@cov.com
**Covington & Burling LLP**
415 Mission St., Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-6000

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC
RE: PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................... 1

II.   FACTUAL BACKGROUND........................................................ 4

    A.   COVID-19 is Highly Contagious and Poses an Imminent and
        Substantial Risk of Serious Harm to Patients at DSH-Patton............. 4

        1.   Defendants Confine Plaintiffs and Class Members in
             Congregate Settings that Create Significant Risk of
             COVID-19 Transmission. ...........................................5

        2.   DSH-Patton is in the Midst of a Dangerous COVID-19
             Outbreak. ...................................................................... 7

    B.   Defendants are Failing to Implement Critical Measures to Protect
        High-Risk Patients and Mitigate the Spread of COVID-19................. 8

        1.   Defendants are Failing to Take Necessary Steps to
             Discharge or Transfer High-Risk Patients to Safer, Less-
             Congregate Settings. ....................................................8

        2.   Defendants are Failing to Enact Adequate Depopulation
             Efforts..........................................................................10

        3.   Defendants Are Failing to Take Appropriate Measures to
             Mitigate the Risk of Transmission Within DSH-Patton. ......... 11

III.  ARGUMENT............................................................................... 12

    A.   Plaintiffs Are Likely to Succeed on the Merits. ............................... 13

        1.   Defendants Continue to Violate Plaintiffs' Due Process
             Rights. .........................................................................13

        2.   Defendants Violate Plaintiffs' Rights Under the ADA. .......... 19

        3.   Defendants Cannot Reasonably Claim That There Is
             Nothing They Can Do to Protect the Lives of Proposed
             Class Members, or That Their Hands Are Tied by
             Superior Court Commitment Orders or Procedures. ................21

    B.   Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief. ..... 23

v

C.   The Balance of Equities and the Public Interest Both Favor
Granting Plaintiffs' Immediate Relief...................................................24

IV.   CONCLUSION.................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES:

4

5

*Ahlman v. Barnes*,
   445 F.Supp. 3d 671 (C.D. Cal. 2020) .................................................*passim*

6

*Alliance for Wild Rockies v. Cottrell*,
7
   632 F.3d 1127 (9th Cir. 2011) ................................................................ 12

8
*Barahona-Gomez v. Reno*,
9
   167 F.3d 1228 (9th Cir. 1999) ................................................................ 25

10
*Basank v. Decker* ,
11
   449 F. Supp. 3d 205 (S.D.N.Y. 2020) .................................................... 23

12
*Bent v. Barr*,
13
   445 F. Supp. 3d 408 (N.D. Cal. 2020) ............................................... 3, 23

14
*Calif. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
15
   766 F.2d 1319 (9th Cir. 1985) ................................................................ 25

16
*Campbell v. Barnes*,
   No. 30-2020-11411117 (Super. Ct. Orange County Dec. 11, 2020).......... 15, 18, 20, 22

17
*Castillo v. Barr*,
18
   449 F.Supp.3d 915 (C.D. Cal. 2020) ................................................. 14, 23

19
*Castro v. Cnty. of Los Angeles*,
20
   833 F.3d 1060 (9th Cir. 2016) ................................................................ 14

21
*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
22
   89 U.S. 189 (1989)................................................................................. 13

23
*Fraihat v. U.S. Immigr. & Customs Enf't*,
24
   445 F. Supp. 3d 709 (C.D. Cal. 2020) ...............................................*passim*

25
*Frontline Med. Assoc., Inc. v. Coventry Healthcare Workers Comp., Inc.*,
   620 F. Supp. 2d 1109 (C.D. Cal. 2009) .................................................. 12

26

27
*Gordon v. Cnty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ................................................................ 13

28

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
366 F.3d 754 (9th Cir. 2004) ........................................................................... 24

*Helling v. McKinney*,
509 U.S. 25 (1993) ............................................................................................ 3

*Henry A. v. Willden*,
678 F.3d 991 (9th Cir. 2011) .......................................................................... 13

*Hernandez v. Cnty. of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015) ........................................................... 25

*In re Von Staich*,
56 Cal. App. 5th 53 (2020), *review filed* (Nov. 16, 2020) ............................. 3, 16, 18

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry*,
543 F.3d 1047 (9th Cir. 2008) ........................................................................ 23

*Jones. v. Blanas*,
393 F.3d 918 (9th Cir. 2004) ................................................................... 5, 17, 19

*Kaur v. U.S. Dep't of Homeland Sec.*,
No. 20-cv-03172, 2020 WL 1939386 (C.D. Cal. Apr. 22, 2020) ....................... 3

*King v. Cnty. of Los Angeles*,
885 F.3d 548 (9th Cir. 2018) .......................................................................... 17

*M.R. v. Dreyfus*,
663 F.3d 1100 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir 2012) ....... 23

*Olmstead v. L.C.*,
527 U.S. 581 (1999) ......................................................................................... 19

*Oregon Advo. Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) ........................................................................ 17

*People v. McKee*,
47 Cal. 4th 1172 (2010) .................................................................................... 5

*People v. Robinson*,
63 Cal. App. 4th 348 (1998) ............................................................................. 5

*Pierce v. Cnty. of Orange*,
526 F.3d 1190 (9th Cir. 2008) ........................................................................ 17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC
RE: PRELIMINARY INJUNCTION

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ........................................................ 3, 13, 14, 22

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) ................................................................ 25

*Steimel v. Wernert*,
823 F.3d 902 (7th Cir. 2016) ................................................................. 20

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ................................................................. 22

*Torres v. Milusnic*,
--- F.Supp.3d ---, No. CV 20-4450, 2020 WL 4197285 (C.D. Cal. July
14, 2020) ......................................................................................... 3, 14, 18

*Torres v. U.S. Dep't of Homeland Sec.*,
411 F. Supp. 3d 1036 (C.D. Cal. 2019) ...................................................... 19

*Updike v. Multnomah Cty.*,
870 F.3d 939 (9th Cir. 2017) ................................................................. 19

*Valdivia v. Schwarzenegger*,
599 F.3d 984 (9th Cir. 2010) ................................................................. 22

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................... 12

*Youngberg v. Romeo*,
457 U.S. 307 (1982) ............................................................................ 17

*Zepeda-Rivas v. Jennings*,
445 F. Supp. 3d 36 (N.D. Cal. 2020) ......................................................... 17

**RULES:**

Fed. R. Civ. P. 65 ..................................................................................... 12

**STATUTES:**

28 C.F.R. § 35.102 .................................................................................... 19

28 C.F.R. § 35.108 .................................................................................... 19

28 C.F.R. § 35.130 .................................................................................. 19, 20

ix

42 U.S.C. § 12132 .................................................................................................... 19

Cal. Gov. Code § 8550 .......................................................................................... 21

Cal. Welf. & Inst. Code § 5000. ........................................................................... 5

**OTHER AUTHORITIES**

CDC, *How to Protect Yourself & Others*,
    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
    sick/prevention.html ................................................................................... 4, 5

CDC, *People with Certain Medical Condition*s,
    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
    precautions/people-with-medical-conditions.html ................................... 5

CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission*,
    https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-
    cov-2.html ...................................................................................................... 4

CDC, *Interim Guidance on Management of Coronavirus Disease 2019
    (COVID-19) in Correctional and Detention Facilities*,
    https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
    detention/guidance-correctional-detention.html ...................................... 8

CDC, *Social Distancing*,
    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-
    distancing.html ............................................................................................. 5

Cal. State Dep't of Hosps., *Department of State Hospitals – Patton*,
    https://www.dsh.ca.gov/Patton/index.html ................................................ 5

Cal. Dep't of State Hosps., *Patient & Staff COVID-19 Tracking*
    https://www.dsh.ca.gov/COVID-19/Patient_and_Staff_COVID-
    19_Tracking.htm .......................................................................................... 7

Cal. Dep't of State Hospitals, *Treatment*,
    https://www.dsh.ca.gov/Treatment/index.html ........................................ 22

Cal. Governor Exec. Ord. N-35-20, Mar. 21, 2020 ......................................... 21

Times Editorial Board, *Editorial: Psychiatric hospitals, like jails, requires*
  *releases in the Covid era*, L.A. Times (Aug. 13, 2020),
  https://www.latimes.com/opinion/story/2020-08-13/covid-mental-
  hospitals-releases ........................................................................... 15

U.S. Const.,  Fourteenth Amendment ................................................... 3, 13, 17

xi

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs Ervin Longstreet, Aldo Hernandez, Charles Gluck, and Graham Waldrop ("Plaintiffs"), and hundreds of other psychiatric patients who are involuntarily confined at Patton State Hospital ("DSH-Patton" or "Patton") are fighting for their lives. The facility, which is one of the largest psychiatric hospitals in the country, is in the midst of a surging COVID-19 outbreak. In the past two weeks alone, more than 113 patients have tested positive for COVID-19. Eighty-nine of these patients tested positive for COVID-19 in the last seven days.

Three of the named Plaintiffs in this lawsuit—Ervin Longstreet, Aldo Hernandez, and Graham Waldrop—tested positive for COVID-19 within the last week. Each of these men has conditions that, according to guidelines from the Centers for Disease Control and Prevention ("CDC"), put them at high risk for severe illness or death from COVID-19. Hundreds of patients at Patton also have health conditions that put them at heightened risk of becoming severely ill or dying from COVID-19.

Defendants Stephanie Clendenin, Director of California Department of State Hospitals ("DSH"), which runs DSH-Patton and four other state psychiatric hospitals, and Janine Wallace, Executive Director of DSH-Patton (collectively, "Defendants"), have failed to take critical measures to protect Plaintiffs despite knowing that Plaintiffs and similarly situated patients at DSH-Patton are especially vulnerable to grave harm.

For months, Defendants have maintained that Patton is sufficiently safe for Plaintiffs despite holding Plaintiffs in crowded, congregate settings where social distancing is impossible. Even while prisons, jails, and immigration detention facilities across the country have taken affirmative measures to reduce their populations in response to the severe threat posed by COVID-19, Defendants have failed to conduct an adequate systematic review of high-risk patients in order to identify who can be safely discharged to a less dangerous setting; facilitate the release or transfer of such high-risk patients to safer, non- or less-congregate settings; or otherwise reduce the patient

population to allow for anything close to adequate social distancing. These failures are responsible for the new deadly surge in COVID-19 infections at Patton.

Many high-risk patients who can be safely discharged to safer and less crowded settings remain trapped in what has become a tinderbox of infections. As but one example, in July, Defendants found Plaintiff Ervin Longstreet—an African American Navy veteran who is a cancer survivor with multiple medical comorbidities—eligible to discharge. After repeated advocacy by Plaintiffs' counsel, Defendants again confirmed him eligible for discharge in September. Yet despite the acknowledged severe risk Mr. Longstreet faces from COVID-19, Defendants continue to hold Mr. Longstreet at Patton. Their failure to act may prove deadly because earlier this month, Mr. Longstreet's crowded unit was exposed to COVID-19, and Mr. Longstreet, along with others in his unit, tested positive for COVID-19 in the past week. Other high-risk patients face similarly dire circumstances. James Moore, who has serious respiratory comorbidities, contracted COVID-19 this week. He is now hospitalized due to difficulty breathing, coughing up blood, and running a persistent fever.

Three prominent experts have reviewed the conditions and circumstances at DSH-Patton: Dr. Peter Chin-Hong, director of the UCSF School of Medicine's Infectious Diseases/Immunocompromised Host and Transplant Infectious Diseases Program, Heather Leutwyler, Ph.D., Associate Professor and Vice-Chair in the Department of Physiological Nursing at the UCSF School of Nursing, and Elizabeth Jones, a nationally recognized expert with over 35 years of experience in monitoring court orders regarding services for individuals with mental illness. Their extensive findings confirm that the conditions at DSH-Patton create enormous risk of COVID-19 transmission and mass outbreaks, putting Plaintiffs at substantial risk of severe illness or death.

In light of the dangerous conditions at DSH-Patton, Plaintiffs seek immediate provisional relief, including discharge or transfer to safer, non- or less-congregate settings for appropriate high-risk patients, depopulation measures to allow for greater

social distancing, and increased infection control for those within the facility. Plaintiffs meet all of the requirements for provisional relief.

*First*, Plaintiffs are likely to succeed on the merits of their claims, or at the very least raise serious questions as to success on the merits. Defendants' failure to take reasonable steps to protect Plaintiffs from an increased risk of severe illness or death, remedy impermissible punitive conditions, or make reasonable accommodations violate Plaintiffs' Fourteenth Amendment Due Process rights and Title II of the Americans with Disabilities Act ("ADA"). *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (Constitution protects people from "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year"). Multiple courts have found that litigants similarly situated to Plaintiffs are likely to succeed on the merits of their claims. *E.g.*, *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020); *In re Von Staich*, 56 Cal. App. 5th 53 (Cal. Ct. App., Oct. 20, 2020), *review filed* (Nov. 16, 2020); *Torres v. Milusnic,* --- F.Supp.3d ---, No. CV 20-4450, 2020 WL 4197285 (C.D. Cal. July 14, 2020); *Ahlman v. Barnes*, 445 F.Supp. 3d 671 (C.D. Cal. 2020); *Zepeda-Rivas v. Jennings*, 445 F.Supp. 3d 36 (N.D. Cal. 2020); *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020); *Bent v. Barr*, 445 F. Supp. 3d 408 (N.D. Cal. 2020); *Kaur v. U.S. Dep't of Homeland Sec.*, No. 20-cv-03172, 2020 WL 1939386 (C.D. Cal. Apr. 22, 2020).

*Second*, Plaintiffs are likely to suffer irreparable harm without immediate relief. Plaintiffs have conditions that place them at increased risk of severe illness from COVID-19. Given the current outbreak at DSH-Patton, Defendants must take the actions this motion seeks in order to adequately protect Plaintiffs and the proposed Class.[1]

*Third*, the balance of equities and public interest tip sharply in favor of Plaintiffs. Any interest Defendants may have in maintaining the status quo at DSH-Patton is outweighed by the high risk of serious harm or death to Plaintiffs and ongoing

---

[1] *See* Pls. *Ex Parte* Appl. for Provisional Class Cert., filed concurrently herewith.

3

constitutional violations. Further, the outbreak at DSH-Patton endangers not only Plaintiffs, but also other patients, staff members, and the community. Without immediate relief, the virus could exacerbate the infections in the community and overwhelm local healthcare resources. In order to save lives, urgent action must be taken now.

## II.   FACTUAL BACKGROUND

### A.   COVID-19 is Highly Contagious and Poses an Imminent and Substantial Risk of Serious Harm to Patients at DSH-Patton.

The accompanying *ex parte* application for provisional class certification relays the factual background of this action in detail. To summarize here, COVID-19 is a highly contagious disease that poses a severe health and safety risk. COVID-19 is principally spread through respiratory droplets produced when an infected person coughs, sneezes, or talks.[2] COVID-19 also can spread through airborne transmission of infected droplets, especially in enclosed spaces with poor ventilation or through contact with contaminated surfaces.[3] Since the onset of the pandemic, locked congregate facilities have been an epicenter of coronavirus transmission, and psychiatric facilities such as DSH-Patton are uniquely vulnerable to COVID-19 outbreaks.

The effects of COVID-19 are "very serious and can include severe respiratory illness, major organ damage, and … death."[4] People with high-risk factors have increased rates of severe illness, with some estimates putting the fatality rate as high as 20%.[5]

---

[2] Chin-Hong Decl. ¶ 6; CDC, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Dec. 13, 2020).

[3] *Id*. ¶¶ 6-7; CDC *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last visited Dec. 13, 2020).

[4] *Id*. ¶ 5.

[5] *Id*. ¶¶ 8-9; Leutwyler Decl. ¶ 15; Hadreas Decl. ¶¶ 16-17, Ex. H; *see also Ahlman*, 445 F. Supp. 3d at 679.

People from certain racial and ethnic groups, including Black and Latinx people, are also at increased risk of getting sick and dying from COVID-19.[6]

Although vaccines have begun to receive approval and a limited supply may be distributed soon, there is no estimate about when full vaccination of the public, including patients at Patton, will occur.[7] Until widespread vaccination occurs, the "best way to protect [oneself from COVID-19] and to help reduce the spread of the virus that causes COVID-19 is to [l]imit …interactions with other people as much as possible."[8] Such social distancing is impossible at DSH-Patton.

### 1. Defendants Confine Plaintiffs and Class Members in Congregate Settings that Create Significant Risk of COVID-19 Transmission.

DSH-Patton is a psychiatric facility in San Bernardino County that confines individuals involuntarily for mental health treatment.[9] Specifically, the patients at DSH-Patton, including Plaintiffs and the proposed Class, were civilly committed to receive treatment.[10]

DSH-Patton's crowded, congregate conditions are of critical concern. The facility operates 1,527 beds and employs more than 2,400 staff who rotate in and out of the

---

[6] Chin-Hong Decl. ¶ 10; Hadreas Decl. ¶ 18.
[7] Chin-Hong Decl. ¶¶ 51-54.
[8] CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 1, 2020); CDC, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (updated Nov. 27, 2020); CDC, *Social Distancing,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (updated Nov. 17, 2020); *see also* Chin-Hong Decl. ¶¶ 17, 55.
[9] Cal. State Dep't of Hosps., *Department of State Hospitals – Patton*, https://www.dsh.ca.gov/Patton/index.html (last visited Dec. 12, 2020).
[10] *See, e.g.*, Cal. Welf. & Inst. Code § 5000 *et seq*. (establishing civil commitment system); *see also People v. McKee*, 47 Cal. 4th 1172, 1207 (2010) (individuals found not guilty of insanity are "civilly committed rather than criminally penalized because of their severe mental disorder"); *People v. Robinson*, 63 Cal. App. 4th 348, 351 (1998) (California's mentally disordered offender law is civil, not penal, in nature); *Jones. v. Blanas,* 393 F.3d 918, 933 (9th Cir. 2004) (sexually violent predator detainees are civilly committed).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

facility each day.[11] Patients are housed in units of approximately 50 patients each.[12] Up to five patients share bedrooms at Patton.[13] The bedrooms at Patton are so small that some patients are able to touch the adjacent beds while sitting or lying on their own beds.[14] Patients must share restrooms, a day room, telephones, computers, and drinking fountains.[15]

Many units are connected to a "sister" unit, which shares a hallway and a day room.[16] Patients from sister units line up in the shared hallway to receive medications.[17] Patients are required to eat at a common dining area shared by patients from multiple units.[18] There is no space for patients to socially distance while eating, when masks cannot be worn.[19] Dining tables are not cleaned adequately.[20] The facility lacks adequate ventilation—including, for example, windows in the patient unit that do not open to allow for fresh air—thus creating additional, unreasonable risk of mass transmission.[21]

---

[11] Jones Decl. ¶ 13.
[12] Longstreet Decl. ¶¶ 8-9, 22; Gluck Decl. ¶¶ 6, 11; Hernandez Decl. ¶¶ 8, 12; Waldrop Decl. ¶¶ 7-8, 18; Aleman Decl. ¶¶ 4, 9, 12; Grajeda Decl. ¶ 6; Marin Decl. ¶¶ 5, 10; Jackson Decl. ¶ 6.
[13] Longstreet Decl. ¶ 12; Gluck Decl. ¶ 7; Hernandez Decl. ¶ 13; Waldrop Decl. ¶¶ 12-13; Aleman Decl. ¶¶ 6, 10; Grajeda Decl. ¶ 7; Marin Decl. ¶ 6.
[14] Hernandez Decl. ¶ 13; Waldrop Decl. ¶ 12.
[15] Longstreet Decl. ¶¶ 10, 15, 17; Gluck Decl. ¶ 8; Hernandez Decl. ¶¶ 9, 11, 14; Waldrop Decl. ¶¶ 8, 10, 14, 17-18; Aleman Decl. ¶ 7; Grajeda Decl. ¶¶ 8-9, 14; Marin Decl. ¶¶ 7, 10.
[16] Longstreet Decl. ¶¶ 9-10, 19, 21; Hernandez Decl. ¶¶ 9, 10, 17; Waldrop Decl. ¶¶ 8-9, 17.
[17] Gluck Decl. ¶ 13; Hernandez Decl. ¶ 10; Waldrop Decl. ¶ 9.
[18] Longstreet Decl. ¶ 18; Gluck Decl. ¶ 9; Hernandez Decl. ¶ 15; Waldrop Decl. ¶ 15.
[19] Longstreet Decl. ¶¶ 18-19; Gluck Decl. ¶ 9; Hernandez Decl. ¶ 16; Waldrop Decl. ¶ 15-16; Aleman Decl. ¶ 11.
[20] Waldrop Decl. ¶ 16.
[21] Gluck Decl. ¶ 10; Grajeda Decl. ¶ 10; Chin-Hong Decl. ¶¶ 25-29.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

Among public health experts, there is general consensus that congregate institutional settings should operate at no higher than 50% capacity.[22] The fully populated, dense, communal conditions at DSH-Patton place patients at high risk.

### 2. DSH-Patton is in the Midst of a Dangerous COVID-19 Outbreak.



Since COVID-19 reached DSH-Patton earlier this year, it has spread steadily throughout the facility and the severity of the recent outbreaks requires an immediate remedy: In the last two weeks alone, at least 113 patients and 87 staff and onsite personnel have tested positive. A graph of DSH's data highlights the current outbreak:[23]

At least ten patients have died from complications due to COVID-19.[24] In one unit of 50 patients, at least 44 have tested positive for COVID-19.[25] And at least three named Plaintiffs—Mr. Hernandez, Mr. Waldrop, and Mr. Longstreet—recently tested positive for COVID-19.[26] Plaintiffs are afraid for their lives.[27]

---

[22] Chin-Hong Decl. ¶ 22.

[23] *Id*. ¶ 13. The Department of State Hospitals posts data on patient and staff positives, as well as information on the number of deaths. *See* Cal. Dep't of State Hosps., *Patient & Staff COVID-19 Tracking* https://www.dsh.ca.gov/COVID-19/Patient_and_Staff_COVID-19_Tracking.html (last visited Dec. 14, 2020).

[24] Hadreas Decl. ¶ 9.

[25] Pederson Decl. ¶ 18.

[26] Pederson Decl. ¶ 7; Hadreas Decl. ¶ 10.

[27] Gluck Decl. ¶ 4; Waldrop Decl. ¶ 4; Hernandez Decl. ¶¶ 37-38; Longstreet Decl. ¶ 5; Marin Decl. ¶ 25; Moore Decl. ¶ 15; Quintana Decl. ¶ 12; Jackson Decl. ¶ 23; Heine

**B.     Defendants are Failing to Implement Critical Measures to Protect High-Risk Patients and Mitigate the Spread of COVID-19.**

Recognizing the substantial risk of COVID-19 spreading in locked congregate settings, the CDC encourages facilities to coordinate with local government agencies and courts to "[c]onsider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable)."[28] The federal Substance Abuse and Mental Health Services Administration ("SAMHSA") recommends use of outpatient treatment "to the greatest extent possible."[29] Despite the known risks of COVID-19 transmission at Patton, Defendants have failed to implement adequate policies and procedures to address the dangerous population density at the facility.

### 1.   *Defendants are Failing to Take Necessary Steps to Discharge or Transfer High-Risk Patients to Safer, Less-Congregate Settings.*

The measures available to Defendants to reduce the patient population and allow for greater social distancing that they have failed to adopt include: undertaking a robust, systematic review of high-risk patients in order to identify who can be safely and effectively discharged to safer, less crowded settings; expediting discharge efforts for high-risk patients with appropriate services and supports; and transferring high-risk patients to non-congregate settings, including utilizing available facilities.[30] Despite the threat that Plaintiffs and class members face, Defendants' "[d]ischarge planning

---

Decl. ¶ 9 (stating that he's never felt more stressed out in his entire life); Tapia Decl. ¶ 8 (describing Patton as feeling like a "ticking time bomb"); Freund Decl. ¶ 5; Lowery Decl. ¶ 6.
[28] *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. (last updated Dec. 3, 2020).
[29] Hadreas Decl. ¶ 13, Ex. E.
[30] Jones Decl. ¶ 33; Hadreas Decl. ¶ 12.

continues to rigidly apply pre-pandemic criteria without considering the physical and mental health risks of continued confinement at DSH-Patton."[31]

The discharge or transfer of high-risk patients is warranted because "many DSH patients can safely and effectively transition to less restrictive settings with appropriate support services."[32] The model for transitioning people with mental health disabilities from institutions to community placements already exists.[33] According to medical and mental health authorities, the treatment of patients in the community mental health system rather than institutions like DSH-Patton is not only reasonable, "it is necessary to protect patients from the physical and mental health risks posed by COVID-19 in congregate facilities."[34]

Defendants' business-as-usual approach has contributed to the current crisis. To illustrate, Defendants found Mr. Longstreet—an African American Navy veteran who is a cancer survivor with medical comorbidities—eligible to discharge from DSH-Patton in July.[35] Despite his heightened risk of severe illness or death from COVID-19 infection, Defendants failed to effectuate his discharge. On or about December 7, 2020, Mr. Longstreet tested positive for COVID-19.[36] James Moore, who has respiratory comorbidities, has been on "pre-Community Outpatient Treatment" status from his treatment team for five years.[37] Despite meeting his major treatment goals, Mr. Moore

---

[31] Leutwyler Decl. ¶ 29 ("Even high-risk patients that are documented as having a viable WRAP and a plan for step-down community treatment face life-threatening delays in discharge.").
[32] Leutwyler Decl. ¶ 28; Jones Decl. ¶¶ 17-19.
[33] Leutwyler Decl. ¶¶ 34-37; *see also id.* ¶¶ 26, 27(a)-(m) (discussing existing community treatment models); Jones Decl. ¶¶ 23-28.
[34] Leutwyler Decl. ¶¶ 22-25, 38 (noting that SAMHSA, American Medical Association, California Mental Health Services Oversight and Accountability Commission, and others support this position); Jones Decl. ¶¶ 3-34; Chin-Hong Decl. ¶¶ 11-12.
[35] Longstreet Decl. ¶ 44, Ex. A.
[36] Hadreas Decl. ¶ 10.
[37] Moore Decl. ¶¶ 4, 11.

remained confined at Patton.[38] He recently stated, "I keep wondering what is going to happen to me if I catch COVID-19 here. With all of my medical conditions, I do not know if I will survive the pandemic."[39] He has now tested positive, and Defendants have transferred him to a local hospital because of his severe symptoms.[40]

Defendants' failure to timely discharge or transfer high-risk patients is particularly striking given that Defendants have ceased providing many forms of mental health treatment due to the COVID-19 pandemic.[41] As Dr. Chin-Hong notes, "[t]he purpose of a psychiatric hospital is to provide necessary, clinically appropriate treatment to the patients it has. Where treatment is or cannot be delivered in a congregate health care facility (especially where the placement is on an involuntary basis, as it is at DSH-Patton), the elevated risk to health from COVID-19 in such a setting is hard to justify."[42]

### 2. *Defendants are Failing to Enact Adequate Depopulation Efforts.*

Despite the well-recognized risk of COVID-19 spreading through Patton, Defendants have refused to take necessary steps to adequately reduce the population of the facility. Although Defendants activated a "surge capacity" facility in Norwalk on December 7, 2020, to transport 43 female patients out of DSH-Patton, this too late, one-time transfer is far insufficient. As noted by Dr. Chin-Hong, Defendants are using this facility "only *after* an untenable number of patients have tested positive at DSH-Patton," as opposed to "proactively … facilitat[ing] adequate social distancing to mitigate the risk of virus transmission (as should be the case)."[43] Despite the Norwalk facility having capacity for 98 patients, Defendants chose to transfer fewer than half of this number out of Patton. Even had Defendants transferred 98 patients out of the Patton, such a step

---

[38] Leutwyler Decl. ¶ 29(q); Pederson Decl. ¶ 42.
[39] Moore Decl. ¶ 15.
[40] Pederson Decl. ¶ 45.
[41] *See, e.g.*, Leutwyler Decl. ¶¶ 33(a)-(c); Chin-Hong Decl. ¶¶ 58-60.
[42] Chin-Hong Decl. ¶ 59.
[43] *Id.* ¶ 24.

would be "insufficient to facilitate adequate reduction of crowding in the DSH-Patton living areas to allow for necessary social distancing for patients."[44]

### 3. *Defendants Are Failing to Take Appropriate Measures to Mitigate the Risk of Transmission Within DSH-Patton.*

Defendants have failed to mitigate the risk of transmission within Patton. For instance, Defendants have fail to: maintain adequate ventilation on the units; disinfect shared spaces regularly; provide necessary cleaning supplies to patients; adopt quarantine protocols that remove infected individuals from a unit without facilitating mass COVID-19 transmission; prevent staff from moving between infected and non-infected units; enforce the proper use of masks and protective equipment; and provide information and education to patients necessary to help them protect themselves.[45]

Defendants' actions, including their quarantine protocols, have exacerbated the risk of mass transmission. For example, Defendants placed Units 26 and 27 on quarantine in October after an infected staff member exposed patients to COVID-19, and that quarantine continuing into December.[46] In early December, dozens of putative Class members in those units tested positive for COVID-19.[47] As Dr. Chin-Hong notes, the outbreak in those and other units—which occurred weeks after quarantine status was implemented—shows that "even with quarantine protocols meant to prevent or slow transmission of the virus, the virus' transmission has accelerated rapidly."[48] Defendants' failure to ensure appropriate social distancing and use of crowded COVID-19 units (including for quarantines) have created a situation "*more* conducive to mass transmission."[49]

---

[44] Chin-Hong Decl. ¶ 24.
[45] Chin-Hong Decl. ¶¶ 25-50 (describing deficiencies in infection control at Patton).
[46] Longstreet Decl. ¶ 35; Gluck Decl. ¶¶ 29, 31; Hernandez Decl. ¶¶ 34, 36; Waldrop Decl. ¶¶ 28-29; Aleman Decl. ¶¶ 18-19; Grajeda Decl. ¶¶ 35-36.
[47] *See* Hadreas Decl. ¶ 10.
[48] Chin-Hong Decl. ¶ 14.
[49] Chin-Hong Decl. ¶ 31.

The surging rates of COVID-19 at Patton "suggest that the steps that DSH has taken to reduce the impact of COVID-19 at the facility are inadequate, or that the crowded congregate setting itself (without sufficient social distancing, poor ventilation, *etc*.) makes the facility unreasonably dangerous for patients at high-risk for severe COVID-19 illness, or (most likely) both."[50] In the words of nationally recognized mental health expert Elizabeth Jones, "critical action needs to be taken now to discharge high-risk patients from Patton… There is no time to waste."[51]

## III.   ARGUMENT

A Temporary Restraining Order ("TRO") may be issued upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The analysis for a TRO and a preliminary injunction is the same. *Frontline Med. Assoc., Inc. v. Coventry Healthcare Workers Compensation, Inc*., 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, a plaintiff need only show that "serious questions" exist as to success on the merits where the balance of hardships tips sharply in the plaintiff's favor and the plaintiff has demonstrated a likelihood of irreparable harm. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Plaintiffs meet the standard for a TRO in this case. Plaintiffs have identified compelling evidence that Defendants have failed to act to control the spread of COVID-

---

[50] Chin-Hong Decl. ¶ 15.
[51] Jones Decl. ¶ 34.

19 throughout Patton and have created substantial and unnecessary risks to the health and lives of the patient population. Immediate action is needed to prevent additional deaths.

### A. Plaintiffs Are Likely to Succeed on the Merits.

Defendants' inadequate response to the COVID-19 outbreak at DSH-Patton violates Plaintiffs' rights under the Fourteenth Amendment and the ADA. Plaintiffs can show a likelihood of success on the merits — or at least raise "serious questions" as to the success on the merits — on either of their claims. *See, e.g.*, *Ahlman*, 445 F. Supp. 3d at 687-92 (finding a likelihood of success on both due process and disability claims); *Fraihat*, 445 F. Supp. 3d at 745 (same).

### 1. *Defendants Continue to Violate Plaintiffs' Due Process Rights.*

#### a) Plaintiffs' Confinement at DSH-Patton Violates the Fourteenth Amendment Right to Reasonable Safety.

When the government takes a person into custody, it gives rise to a "special relationship," *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2011), with a constitutionally imposed duty to provide for "reasonable health and safety." *Roman*, 977 F.3d at 943 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989)).

To state a due process deliberate indifference claim based on a failure to provide for reasonable health and safety, plaintiffs must show that the government:

> (i) [ ] made an intentional decision with respect to the conditions under which the plaintiff[s] w[ere] confined; (ii) those conditions put the plaintiff[s] at substantial risk of suffering serious harm; (iii) the [government] did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved . . . ; and (iv) by not taking such measures, the [government] caused the plaintiff[s'] injuries.

*Id*. at 943 (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018)). For the third element, Plaintiffs must only show that Defendants' actions are "objectively unreasonable"; plaintiffs need not demonstrate Defendants' "*subjective awareness* of the

13

risk of harm." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1968, 1071 (9th Cir. 2016) (en banc). Plaintiffs satisfy each of these elements.

*First*, Defendants are intentionally holding Plaintiffs in dense, congregate conditions known to facilitate the spread of COVID-19. Defendants require Plaintiffs to spend significant time in crowded spaces—such as shared bedrooms, communal bathrooms, and common day rooms—and to use communal water fountains, telephones, and more.[52] Defendants likewise require Plaintiffs to eat at a common dining area shared by patients from multiple units and stand in crowded medication lines.[53] Plaintiffs cannot avoid contact with other patients and staff members who move in and out of the hospital and between units.[54] Social distancing is thus impossible.[55] The conditions in which Defendants hold Plaintiffs "contradict[] the very measures urged as precautions to infection from COVID-19."[56]

*Second*, Defendants continue to subject Plaintiffs to substantial, unnecessary risk of serious harm and death. COVID-19 is a highly contagious respiratory virus that is particularly dangerous to Plaintiffs and class members because their underlying medical conditions significantly increase the risk of severe illness or death should they contract COVID-19.[57] Courts across the country have recognized that the spread of COVID-19 within locked congregate settings constitutes a substantial risk of serious harm. *See, e.g.*, *Roman*, 977 F.3d at 943; *see also Torres*, 2020 WL 4197285, at *9 ("Petitioners show they are at substantial risk of exposure to COVID-19, which is inconsistent with

---

[52] *See, e.g.*, Longstreet Decl. ¶¶ 10, 12, 15, 17; Gluck Decl. ¶¶ 7-8; Hernandez Decl. ¶¶ 9, 11, 13-14; Waldrop Decl. ¶¶ 8, 10, 12-14, 17-18; Aleman Decl. ¶¶ 6-7; Grajeda Decl. ¶¶ 7-9, 14; Marin Decl. ¶¶ 6-7, 10; Jackson Decl. ¶ 6.

[53] *See, e.g.*, Longstreet Decl. ¶¶ 9, 18, 19, 21; Hernandez Decl. ¶¶ 9-10, 12, 15, 17; Waldrop Decl. ¶¶ 8-9, 15, 17; Gluck Decl. ¶¶ 9, 13; Aleman Decl. ¶¶ 4, 7, 11; Marin Decl. ¶ 9.

[54] Longstreet Decl. ¶¶ 10, 19; Gluck Decl. ¶ 15; Hernandez Decl. ¶ 12; Waldrop Decl. ¶ 11.

[55] Chin-Hong Decl. ¶ 17-22; *see also* Leutwyler Decl. ¶ 20.

[56] Jones Decl. ¶ 13.

[57] Chin-Hong Decl. ¶¶ 8-12; Leutwyler Decl. ¶¶ 13-17.

14

contemporary standards of human decency."); *Fraihat*, 445 F. Supp. 3d at 744 ("once a facility has a few cases, the disease spreads rapidly, despite IHSC and CDC protocols."); *Castillo v. Barr*, 449 F.Supp.3d 915, 920 (C.D. Cal. 2020) ("A civil detainee's constitutional rights are violated if a condition of his confinement places him at substantial risk of suffering serious harm, such as the harm caused by a pandemic."). As in each of these cases, there can be no reasonable dispute that a substantial risk of serious harm is present here.

*Third*, Defendants have not taken reasonable and available steps to protect Plaintiffs from such risk. It is well-known that "locked psychiatric facilities [such as Patton], just like jails and prisons, are jam-packed incubators for disease that should be made safer by judicious but significant releases and alternative placements."[58] Despite the recent surge in positive cases and increase in deaths within DSH-Patton, Defendants have failed to expedite discharge planning for high-risk patients, transfer high-risk patients to non-congregate settings, or otherwise meaningfully reduce the patient population to enable patients to practice the social distancing necessary to protect themselves from serious illness or death.[59] *See Campbell v. Barnes*, No. 30-2020-11411117, at 16-17 (Super. Ct. Orange County Dec. 11, 2020) (finding deliberate indifference where measures taken by Sheriff in response to COVID-19 lacked the "very cornerstone of a successful abatement plan, namely a sufficient reduction in jail population to enable proper social distancing").[60]

Defendants' current protocols *exacerbate* the current crisis. Although Defendants placed a significant number of Patton's housing units on quarantine in early October

---

[58] Times Editorial Board, *Editorial: Psychiatric hospitals, like jails, requires releases in the Covid era*, L.A. Times (Aug. 13, 2020), https://www.latimes.com/opinion/story/2020-08-13/covid-mental-hospitals-releases. Plaintiffs' counsel have been communicating with DSH leadership since April about feasible methods to protect patients, to no avail. Hadreas Decl. ¶¶ 29-30, Exs. P, Q.

[59] *See, e.g.*, Chin-Hong Decl. ¶¶ 17-24; Leutwyler Decl. ¶¶ 22-25.

[60] https://www.aclu.org/sites/default/files/field_document/20.12.11_campbell_order.pdf.

2020, the transmission of COVID-19 has exploded in recent weeks—with 44 out of 50 patients testing positive in just one unit.[61] Rather than preventing the spread of the virus, Defendants' use of congregate infection units to quarantine patients with COVID-19 has created a situation "*more* conducive to mass transmission."[62] Defendants also have allowed Patton staff to "float" between contaminated units and uninfected units,[63] thereby unreasonably increasing transmission risks.[64] Further, contrary to CDC guidelines, Defendants are not providing patients with adequate ventilation, access to cleaning supplies, or patient education and information, and they are not adequately enforcing face covering protocols.[65] Given the surge in infections that is overwhelming Patton, Defendants' actions are objectively unreasonable.[66] *Cf. In re Von Staich*, 56 Cal. App. 5th at 80 ("In the face of this pandemic, which appears to take its greatest toll among older individuals and in congregate living situations, and in an aged facility with all the ventilation, space, and sanitation problems … respondents' failure to immediately adopt and implement measures designed to … permit physical distancing between inmates is morally indefensible and constitutionally untenable.").

*Finally*, Defendants' conduct harms Plaintiffs. More than 100 patients have tested positive in the past two weeks, including three named Plaintiffs.[67] Certain infected

---

[61] Pederson Decl. ¶ 18; Chin-Hong Decl. ¶¶ 13-14.
[62] Chin-Hong Decl. ¶ 31.
[63] Longstreet Decl. ¶ 35; Gluck Decl. ¶¶ 28, 31; Hernandez Decl. ¶ 36; Waldrop Decl. ¶¶ 27, 29; Grajeda Decl. ¶ 36.
[64] Chin-Hong Decl. ¶¶ 40-45.
[65] Chin-Hong Decl. ¶¶ 25-50 (describing deficiencies in COVID-19 practices at Patton).
[66] Chin-Hong Decl. ¶ 15; *cf. Fraihat*, 445 F. Supp. 3d at 744–45 ("[w]hile Defendants took some available measures to mitigate the threat of COVID-19," there was still a "serious question" whether defendants' actions were "an objectively 'reasonable' response to a pandemic, given the high degree of risk and obvious consequences of inaction).
[67] Hadreas Decl. ¶¶ 8, 10; Pederson Decl. ¶¶ 7, 18; *see also* Chin-Hong Decl. ¶¶ 34-35 (infected patients at Patton are placed at even greater risk given congregate infection units) and *id.* ¶¶ 56-57 (discussing risk of re-infection and related risks even after recovery).

patients have experienced severe symptoms and require hospitalization; at least ten have died due to the pandemic.[68] Urgent action is required to avoid further tragedy.

### b) Defendants' Actions Subject Plaintiffs to Impermissible Punitive Conditions

The conditions of Plaintiffs' detention during the COVID-19 pandemic also constitute impermissible punishment under the Fourteenth Amendment's Due Process Clause. Plaintiffs are civil detainees who are entitled to "more considerate treatment" than criminal detainees and therefore may not be subjected to punitive conditions. *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004). "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Youngberg v. Romeo*, 457 U.S. 307, 315-316 (1982); *see also Oregon Advo. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (holding that the substantive due process rights of civil detainees are not governed solely by the deliberate indifference standard); *King v. Cnty. of Los Angeles*, 885 F.3d 548, 556-57 (9th Cir. 2018) ("Under the Due Process Clause of the Fourteenth Amendment, an individual detained under civil process ... cannot be subjected to conditions that 'amount to punishment.'") (citation omitted).

To establish such a violation, Plaintiffs need not show that Defendants intended to subject them to punishment. *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). Conditions of confinement are considered "presumptively punitive" if: (1) they are "identical to, similar to, or more restrictive than, those in which [a civil detainee's] criminal counterparts are held," *Jones,* 393 F.3d at 934; or (2) where those conditions "are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods," *id*. at 932. If plaintiffs establish one of these presumptions, "the burden shifts to the defendant to show (1) legitimate, non-punitive interests justifying the

---

[68] Pederson Decl. ¶ 45; Hadreas Decl. ¶ 9.

conditions of [the detained person's] confinement and (2) that the restrictions imposed . . . [are] not excessive in relation to these interests." *King*, 885 F.3d at 557 (internal quotation marks omitted).

Here, Plaintiffs are likely to establish, or at least raise serious questions as to the success of the merits, that Defendants' treatment constitutes punitive conditions. While the purpose of holding Plaintiffs at DSH-Patton is to provide clinically indicated treatment, Defendants have significantly reduced treatment for at least several months, with certain programming on hold altogether.[69] As Dr. Chin-Hong observed, "[w]ithout provision of clinically indicated treatment, an involuntary mental health treatment facility becomes little more than a detention facility, like a jail or a prison."[70] Further, there are alternative, less punitive methods of treating Plaintiffs, such as community-based mental health services that can provide appropriate treatment.[71] No non-punitive basis requires Plaintiffs' continued confinement.

Throughout the country, jails and prisons have released hundreds of *criminal* detainees for this reason. *See, e.g.*, *Campbell*, No. 30-2020-11411117 (ordering the release or transfer of the number of inmates necessary to ensure that all dorms and multi-person cells are populated at no greater than 50% capacity); *In re Ivan Von Staich*, 56 Cal. App. 5th at 84-85 (ordering San Quentin State Prison to reduce prison population to 50% capacity to remedy risk of substantial harm); *Torres,* 2020 WL 4197285, at *23; *Ahlman*, 445 F.Supp. 3d at 694-95. In contrast, Defendants have failed to take reasonable and necessary measures to facilitate adequate social distancing, leading to multiple large COVID-19 outbreaks among the *civilly-committed* patients in their custody.[72] Defendants

---

[69] Leutwyler Decl. ¶¶ 33(a)-(c); Chin-Hong Decl. ¶¶ 58-59; Gluck Decl. ¶¶ 33-34; Hernandez Decl. ¶ 40; Longstreet Decl. ¶¶ 40-41; Waldrop Decl. ¶ 33.

[70] Chin-Hong Decl. ¶ 60; *see also id.* ¶ 59 ("Where treatment is or cannot be delivered in a congregate health care facility . . . the elevated risk to health from COVID-19 in such a setting is hard to justify.").

[71] *See* Jones Decl. ¶¶ 23-28; Leutwyler Decl. ¶¶ 26, 27(a)-(m).

[72] Chin-Hong Decl. ¶¶ 13-15.

18

waited until *after* a major outbreak at Patton to utilize "surge capacity" for 43 patients at a facility with capacity for more than 1,500 patients; this belated closing-of-the-barn-door decision is itself "insufficient . . . to allow for necessary social distancing for patients."[73] Further, Defendants have failed to expeditiously conduct assessments of patients regarding their suitability for release or take affirmative measures to effectuate prompt discharges or transfers.

Plaintiffs establish that their conditions are presumptively punitive because the "restrictions" imposed on Patton patients—crowded, high-risk confinement without provision of clinically indicated treatment—are more restrictive than their criminal counterparts and "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (quoting *Jones*, 393 F.3d at 932). Defendants cannot point to any legitimate, non-punitive interests to justify the current conditions— particularly in light of the recent deadly surge in infections—or show that the current punitive restrictions are not excessive.

## 2. Defendants Violate Plaintiffs' Rights Under the ADA.

Defendants' actions violate Title II of the ADA, which prohibits public entities from discriminating based on disability. 42 U.S.C. § 12132. Plaintiffs and the proposed Class are qualified individuals with disabilities within the meaning of the ADA. *Id.*§ 12102(1)(A), (2)(B), 28 C.F.R. § 35.108(d)(2)(iii).

To comply with Title II, public entities must take affirmative steps to ensure that people with disabilities can participate in programs, benefits, and services on an equal and equally safe basis as people without disabilities. 28 C.F.R. §§ 35.102(a), 35.130(a), (b); *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017). These obligations include making reasonable modifications to policies, practices, or procedures where necessary to avoid disability discrimination. 28 C.F.R. § 35.130(b)(7)(i).

---

[73] *Id.* ¶¶ 23-24.

Plaintiffs are entitled to reasonable accommodations to ensure that they can participate equally and with equal safety in all activities provided by Defendants, including constitutionally adequate care and treatment for their mental illness during confinement. If Plaintiffs contract COVID-19 and experience significant illness or worse, they cannot access these services.

Defendants also fail to provide treatment to Plaintiffs in the "most integrated setting appropriate for [their] needs," as required by the ADA. *See* 28 C.F.R. § 35.130(d). Unnecessary institutionalization is a form of discrimination prohibited by the ADA. *Olmstead v. L.C.*, 527 U.S. 581, 597-601 (1999). There are Plaintiffs and Class members currently detained at Patton for whom less restrictive, more integrated settings would be appropriate.[74] For example, Mr. Longstreet's treatment team has, for months, found him appropriate for discharge to a less restrictive placement, yet he remains confined.[75]

The continued confinement of high-risk patients at Patton who would be better served in less restrictive environments unnecessarily endangers their health.[76] By refusing to effectuate discharge for eligible, at-risk Class members who could receive treatment in a less restrictive and less congregate setting, Defendants subject Class members to discrimination in the form of unnecessary institutionalization.

Defendants' actions also impermissibly "utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i). Policies that create a disparate impact against people with disabilities violate this

---

[74] Leutwyler Decl. ¶ 28; Jones Decl. ¶ 19.

[75] Leutwyler Decl. ¶ 29 Longstreet Decl. ¶¶ 44-45; *see also Steimel v. Wernert*, 823 F.3d 902, 916 (7th Cir. 2016) (finding that public entity "cannot avoid the integration mandate by binding its hands in its own red tape.").

[76] Jones Decl. ¶ 34 ("Given the extraordinary risks to patients in congregate settings like those at Patton, efforts to utilize and, if necessary, expand community-based options are necessary both to realize the requirements of *Olmstead* . . . and to mitigate the elevated and avoidable risks to patients' health and well-being."); *see also* Chin-Hong Decl. ¶ 58-61.

provision. *See, e.g.*, *Campbell*, No. 30-2020-11411117, at 25 (finding disability discrimination under California law where defendant failed to "address the uncontested fact that for medically vulnerable inmates (including those with a qualifying disability) [who are] not released, the current conditions in the Jail place them at substantially greater risk of and from a COVID-19 infection than the inmate population at large").

Here, Defendants have treated the proposed Class similarly to other patients in regards to infection control and social distancing. They have failed to provide additional essential protections, such as space for social distancing, in the face of incontrovertible evidence that Class members are at higher risk for severe illness or death.[77] Plaintiffs cannot access the mental health services to which they are entitled if they contract COVID-19, defeating or substantially impairing the DSH's objectives.

### 3. *Defendants Cannot Reasonably Claim That There Is Nothing They Can Do to Protect the Lives of Proposed Class Members, or That Their Hands Are Tied by Superior Court Commitment Orders or Procedures.*

In March 2020, the State of California authorized Defendant Clendenin to take whatever steps are necessary to protect the patients in her custody and care.

Governor Newsom's March 21, 2020 Executive Order N-35-20, recognized that "state institutions housing vulnerable populations, such as those operated by the Department of State Hospitals . . . require special measures to protect those populations from COVID-19 and ensure continuity of care."[78] Under the order, Defendant Clendenin is empowered to waive requirements under state law as warranted "to protect the health,

---

[77] Chin-Hong Decl. ¶¶ 13-16; Leutwyler Decl. ¶ 15 (noting that the estimated fatality rate for high-risk individuals who contract COVID-19 is up to 20%); Hadreas Decl. ¶ 11.

[78] Hadreas Decl. ¶ 28, Ex. O (Cal. Governor Exec. Ord. N-35-20, Mar. 21, 2020). The Governor's order should be read in tandem with California's longstanding legislative commitment to protect its residents in times of emergency: "The state has long recognized its responsibility to mitigate the effects of natural, manmade, or war-caused emergencies that result in conditions of disaster or in extreme peril to life, property, and the resources of the state, and generally to protect the health and safety and preserve the lives and property of the people of the state."  Cal. Gov. Code § 8550.

safety and welfare of patients with mental or behavioral health conditions committed to the State Department of State Hospitals facilities":

> [T]he Director of the State Department of State Hospitals may issue directives waiving any provision or requirement of the Welfare and Institutions Code; any provision or requirement of the Penal Code that affects the execution of laws relating to care, custody, and treatment of persons with mental illness committed to or in the custody of the State Department State Hospitals. . . . Any waivers and extensions granted pursuant to this paragraph shall be posted on the Department's website.[79]

To date, Defendant Clendenin has issued *no* waivers of state law pursuant to the March 21 Executive Order to facilitate discharges or transfers necessary to ensure adequate social distancing or related population-based virus transmission precautions.[80]

Defendants have the authority under the March 21 Executive Order to take affirmative steps to protect Plaintiffs and the proposed Class. They have not done so. Because they have clear emergency authority to act, Defendants cannot avoid their legal and constitutional duties to Plaintiffs by relying on superior court commitment orders or state law procedures. *Cf. Campbell*, No. 30-2020-11411117 at 27 ("Because Respondent has failed to reduce jail population sufficiently to ensure appropriate social distancing, the abuse of discretion lies in his failure to then consider all medically vulnerable inmates, including those with disabilities rendering them medically vulnerable, for release under the authority granted by [state law].").

Given Defendants' failure to act, this Court has authority to order broad relief to ensure that Plaintiffs' constitutional rights are protected. *Roman*, 977 F.3d at 942; *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992); *see also Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010).

---

[79] Hadreas Decl. ¶ 28, Ex. O (Exec. Ord. N-35-20 at Ord. (5)).
[80] *See* Cal. Dep't of State Hospitals, *Treatment*, https://www.dsh.ca.gov/Treatment/index.html (last visited Dec. 13, 2020).

### B.       Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Castillo*, 449 F. Supp. 3d at 923. Plaintiffs and the proposed Class have demonstrated irreparable harm.

The grave risk of a "severe, and quite possibly fatal, infection . . . constitutes irreparable harm warranting" relief. *Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020); *see also M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir 2012); *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1047, 1050 (9th Cir. 2008).

Multiple courts have found irreparable harm in circumstances analogous to Plaintiffs'. *See, e.g.*, *Fraihat*, 445 F. Supp. 3d at 749 ("Even in the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of potential COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case."); *Ahlman*, 445 F. Supp. 3d 692 ("Certainly, there is no greater irreparable harm than death."); *Bent*, 445 F. Supp. at 419 (finding irreparable harm where ICE detainee's condition put him at high risk for illness or death from COVID-19); *Castillo*, 449 F. Supp. 3d at 923 (same).

As discussed above, Plaintiffs and the proposed Class have conditions that put them at heightened risk of severe illness or death from COVID-19. They are at grave risk of COVID-19 infection if they remain confined under current conditions. As described by Dr. Leutwyler, "patients at DSH-Patton are at increased risk of contracting COVID-19 as compared to community mental health facilities and transitional housing programs, which have patient populations that are far smaller than DSH-Patton."[81]

While Defendants may claim that a forthcoming vaccine for healthcare workers will mitigate the risk that Plaintiffs face, such a prospect remains speculative because the vaccine distribution timeline remains uncertain. Moreover, any forthcoming vaccine will

---

[81] Leutwyler Decl. ¶ 21.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

not arrive soon enough to mitigate the widespread transmission currently affecting high-risk patients. Put simply: "[u]ntil public health data affirmatively demonstrate that the risk of COVID-19 transmission and severe illness has abated, there is no scientific basis for refraining from any and all available measures to prevent virus transmission, especially in congregate facilities like DSH-Patton."[82]

Unless this Court intervenes now, Plaintiffs and the proposed Class are at grave and imminent risk of serious illness or death.

## C. The Balance of Equities and the Public Interest Both Favor Granting Plaintiffs' Immediate Relief.

The balance of equities and the public interest both tip sharply towards Plaintiffs. *Fraihat*, 445 F. Supp. 3d at 749 ("Where the government is the opposing party, balancing of the harm and the public interest merge."); *id.* ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights" and there is "no public interest in exposing vulnerable persons to increased risks of severe illness and death."); *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (interest in protecting people from physical harm outweighs government financial concerns).

Plaintiffs seek an immediate assessment of proposed Class members to effectuate, whenever possible, discharge or transfer to non-congregate or less-congregate settings.[83] Plaintiffs also seek a remedial order to ensure that Defendants implement adequate social distancing at Patton, as well as additional infection control measures to address the deficiencies identified by UCSF infectious disease expert Dr. Chin-Hong.

Any purported interest that Defendants may have in continued confinement is far outweighed by the significant risk of severe illness or death to Plaintiffs. To the extent

---

[82] Chin-Hong Decl. ¶¶ 51-55.
[83] Leutwyler Decl. ¶ 26 ("Through effective individualized assessments, a discharge/treatment planning team can identify appropriate housing and services that are tailored to individual patient needs for many DSH-Patton residents.").

24

that Defendants claim an interest in continued confinement of Plaintiffs due to their mental health treatment needs, Defendants have suspended treatment programming at DSH-Patton, including all group therapy sessions.[84] Many proposed Class members require treatment services that can be provided in safer settings, and many have already been found appropriate for discharge yet remain confined at DSH-Patton.[85] No reason exists why they should remain at DSH-Patton rather than move to safer, non-congregate settings. To the extent public safety concerns exist, the requested patient assessments can include an evaluation of whether the patient can be transitioned into an appropriate placement to address such risk.[86]

Finally, preventing COVID-19 from spreading within DSH-Patton furthers the interests of the public. Patton's staff enter and exit the facility daily, which means that infection rates at the facility affect staff members' families and communities.[87] The continued spread of COVID-19 at Patton strains hospital resources within San Bernardino County: DSH data from December 11 shows that at least 11 Patton patients have required hospitalization for acute COVID-19 symptoms.[88] Even without this influx, hospital resources in San Bernardino County are stretched dangerously thin.[89]

## IV. CONCLUSION

Plaintiffs respectfully request that the Court grant this *ex parte* application and order the relief set forth in the accompanying proposed order as the earliest possible time.

---

[84] Leutwyler Decl. ¶¶ 33(a)-(c).
[85] *Id.* ¶¶ 28- 29(a)-(b).
[86] *Id.* ¶¶ 26-28, 34-36.
[87] *Id.* ¶ 43.
[88] Hadreas Decl. ¶ 8, Ex. C.
[89] Under Rule 65(c), courts have discretion when granting a TRO or preliminary injunction to set no bond or only a nominal bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). The Court should waive a bond because the injunction serves the public interest, Plaintiffs are likely to prevail, and the suit is brought by involuntarily confined patients with limited means. Hadreas Decl. ¶ 33; *see Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 958-59 (N.D. Cal. 2015); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Calif. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

1

2

3  DATED: December 14, 2020          Respectfully submitted,

4                                   By:   */s/ Anne Hadreas*
5                                   JENNIFER STARK (SBN: 267062)
                                    Jennifer.Stark@disabilityrightsca.org
6                                   AARON FISCHER (SBN: 247391)
                                    Aaron.Fischer@disabilityrightsca.org
7                                   ANNE HADREAS (SBN: 253377)
8                                   Anne.Hadreas@disabilityrightsca.org
                                    SARAH GREGORY (SBN: 303973)
9                                   Sarah.Gregory@disabilityrightsca.org
                                    KIM PEDERSON (SBN: 234785)
10                                  Kim.Pederson@disabilityrightsca.org
11                                  **Disability Rights California**
                                    1330 Broadway, Suite 500
12                                  Oakland, CA 94612
13                                  Telephone: (510) 267-1200

14

15                                  By:   */s/ Samantha Choe*
16                                  SAMANTHA CHOE (SBN: 252002)
                                    schoe@cov.com
17                                  ADDISON THOMPSON* (SBN: 330251)
18                                  athompson@cov.com
                                    SYLVIA HUANG (SBN: 313358)
19                                  syhuang@cov.com
20                                  ANNIE SHI (SBN: 327381)
                                    ashi@cov.com
21                                  **Covington & Burling LLP**
22                                  415 Mission St., Ste. 5400
                                    San Francisco, CA 94105
23                                  Telephone: (415) 591-6000

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TRO AND OSC
RE: PRELIMINARY INJUNCTION