SAMANTHA CHOE (SBN: 252002)
schoe@cov.com
ADDISON THOMPSON* (SBN: 330251)
athompson@cov.com
SYLVIA HUANG (SBN: 313358)
syhuang@cov.com
ANNIE SHI (SBN: 327381)
Covington & Burling LLP
415 Mission St., Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-6000

JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 24739
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)
Kim.Pederson@disabilityrightsca.org
Disability Rights California
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201
*Attorneys for Plaintiffs*

\* *C.D. California admission application forthcoming*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| RICHARD HART et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHANIE CLENDENIN, Director of California Department of State Hospitals, in her official capacity et al.,<br><br>Defendants. | Case No. 5:20-cv-1559-JGB-SHK<br><br>**DECLARATION OF ELIZABETH JONES**<br><br>Date: TBD<br>Time: TBD<br>Judge: Hon. Jesus G. Bernal<br>Courtroom: 7D<br><br>Compl. filed: 08/05/2020 |

I, Elizabeth Jones, declare:

1. I have been retained by Plaintiffs as an expert witness in the above captioned matter.

**Relevant Experience**

2. I have over 35 years of experience in implementing or monitoring federal and state court orders regarding services for individuals with a mental illness and/or a developmental disability. A copy of my CV is attached here as **Exhibit A.**

3. I have had administrative responsibility for four institutions including three public psychiatric hospitals for individuals who were admitted with forensic or civil commitment status. I was the Receiver of a psychiatric hospital in Maine and I directed hospitals in Massachusetts and the District of Columbia. In each of these settings, I worked closely with clinical staff to design and effectuate individualized plans so that discharges to the community could occur in a timely and responsible manner.

4. Currently, I am the Independent Reviewer for a Settlement Agreement between the United States Department of Justice and the State of Georgia, *United States v. Georgia*, No. 10-249 (ND. Ga.). In part, this Agreement requires the development of community-based services for adults at risk of hospitalization in a state psychiatric facility or in the process of being discharged from one. I have consulted on the implementation of similar agreements in Oregon and North Carolina.

5. From 2004 until 2017, I served as the Court Monitor in *Evans v. Bowser*, No. 76-293 (D.D.C.), a federal class action lawsuit concerning the care and treatment of people with intellectual and developmental disabilities in the District of Columbia. As Court Monitor, I oversaw and reported on implementation of court orders related to the development of community-based, individualized services/supports for former residents of the District-operated Forest Haven

institution (now closed) for children and adults with intellectual and/or developmental disabilities.

6. As an expert consultant, I have had experience in reviewing the status of individuals in public and private institutions in Massachusetts, Texas, New York, Illinois, North Carolina, and Virginia. I have testified about institutional conditions and the development of alternative community-based programs in Massachusetts, Illinois, Utah, and New York.

7. I have previously consulted with California's Protection and Advocacy system for persons with disability regarding services available for persons at risk of institutionalization in Alameda County. My work on the Alameda County matter included touring the psychiatric hospital, a mental health rehabilitation center, Alameda County Jail, and a review of the community-based services available for persons with serious mental illness who have experienced psychiatric institutionalization.

8. I have recently provided expert input in cases involving the threat that COVID-19 poses to individuals in locked psychiatric institutions, including in Washington D.C., Connecticut, and California.

9. In order to complete this Declaration, I reviewed numerous documents including: the Class Action Complaint in this case; the affidavits of named plaintiffs and class members; policies, reports, memoranda, letters, and plans issued by the Department of State Hospitals ("DSH"); the State of California's July 2020 audit of the *Lanterman-Petris-Short Act*; letters from DSH to the Public Guardian of twelve counties regarding the discharge of clinically eligible LPS patients; materials related to DSH's Conditional Release Program, and recent COVID-19-related litigation.

10. Based on the information that I have reviewed and carefully considered, it is my professional opinion that critical action needs to be taken now to discharge high-risk patients from DSH-Patton in light of the COVID-19 outbreak.

Many patients at Patton do not require inpatient care, and there are many options for discharging patients safely from Patton to less restrictive settings. Given the extraordinary risks high-risk patients currently face at DSH-Patton, efforts to utilize and, if necessary, expand community-based options must be taken immediately.

### Patton State Hospital is rife for the spread of COVID-19 and extremely dangerous for patients who are high risk.

11. The spread of COVID-19 in large, crowded, congregate settings such as psychiatric hospitals is an extremely serious risk, particularly to older adults and individuals with certain medical conditions.[1] This risk is particularly great at a place like Patton State Hospital, one of the largest psychiatric hospitals in the country.

12. I understand that, based on DSH's own assessments, approximately twenty-five percent of its patient population is over the age of sixty. In addition, individuals diagnosed with mental illness have a twenty percent increased risk of morbidity and mortality than the general population. This estimate is in line with my own experience working with individuals with mental illness.

13. Based on information I have reviewed and my experience, it is my opinion that the conditions at Patton appear rife for the spread of COVID-19. Patton operates approximately 1,527 beds and employs more than 2,400 staff who rotate in

---

[1] *See, e.g., Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last updated Oct. 5, 2020); Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Dec. 3, 2020); CDC, *People at Risk for Severe Illness, Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html; CDC, *People at Risk for Severe Illness, People with Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; CDC, Health Equity Considerations and Racial and Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

and out of the facility each day. The setting contradicts the very measures urged as precautions to infection from COVID-19. Social distancing cannot be accomplished within the hospital.[2] Patients also report that staff members' adherence to the wearing of masks is not consistent; there are limited opportunities for disinfecting shared spaces including bathrooms, telephones, and common areas on the unit; and staff float between units regardless of whether the units are under quarantine.[3]

14. I am aware that Patton is currently in the midst of a major COVID outbreak. The number of positive tests and deaths at Patton are currently the highest among all of the state hospitals.

15. I have been informed that some of the named plaintiffs in this lawsuit, including Mr. Longstreet, Mr. Hernandez, and Mr. Waldrop, have recently tested positive for COVID-19. I understand that seventy out of 100 people in their units may have recently tested positive as well.

16. The gravity and urgency of the situation cannot be overstated. I am extremely concerned that Mr. Longstreet, Mr. Hernandez, Mr. Waldrop, and other patients at Patton who are older and/or have certain medical conditions are now facing severe risk of harm or death from COVID-19 at Patton.

**Many Patients from Patton Do Not Require Inpatient Care.**

17. Based on the materials I have reviewed and my experience, it is my opinion that there are significant numbers of high-risk patients at Patton who do not require an inpatient level of care – in other words, many patients can be safely and effectively placed and served in a less restrictive and less congregate setting.

18. As but one data point, I understand that, as of January 2020, a state audit found that at least 138 individuals being treated at DSH facilities under the

---

[2] For example, there are up to five people to a bedroom and bathrooms, day rooms, and telephones are shared by up to fifty people at a time. Some spaces, such as dining halls and narrow hallways are shared by up to 100 people at a time.

[3] *See, e.g.*, Declarations of Ervin Longstreet, Aldo Hernandez, Charles Gluck, Graham Waldrop, Albert Aleman, Charles Jackson, and Jose Marin.

Lanterman-Petris-Short Act were ready for discharge, but had not yet been discharged to lower levels of care. As of mid-August, DSH sent letters to the Office of Public Guardian in Los Angeles stating that it had identified at least thirty-five patients who were clinically ready for discharge to the community. DSH sent similar letters on behalf of individuals ready for discharge to the Public Guardian Offices in the Counties of Orange, Alameda, Contra Costa, Modoc, Monterey, Napa, San Francisco, Santa Clara, Shasta, Stanislaus, and Tulare.

19. While it is unclear exactly how many patients DSH considers to be ready for discharge from Patton at this time, it appears from the declarations and documents that I have reviewed that there remain a substantial number of patients who could be discharged to a less restrictive setting that is appropriate to their individual circumstances.

20. While I support the movement of patients out of DSH-Patton, I am concerned that transferring patients to another congregate setting may simply transfer the risk of infection. In my opinion, it would be far safer for high risk patients to be discharged to less-congregate and less restrictive settings.

**There Are Many Options for Discharging Patients from DSH-Patton to Less Restrictive Settings.**

21. These are not ordinary times and therefore compel different strategies. Among any of the strategies DSH is implementing in response to the COVID-19 pandemic, increased attention must be paid to responsible, expedited discharge, particularly for patients who are high risk for severe illness or death from COVID-19.

22. Releasing high risk individuals from congregate settings in light of serious risk posed by COVID-19 is not unique. Indeed, courts within California have already ordered the release or transfer of individuals from locked, congregate facilities such as jails, prisons, and immigration detention centers. *See, e.g.*, *Roman*

6
DECLARATION OF ELIZABETH JONES

*v. Wolf*, 977 F.3d 935, 939, 9943 (9th Cir. 2020); *In re Von Staich*, 56 Cal. App. 5th 53 (Cal. Ct. App., Oct. 20, 2020); *Torres v. Milusnic,* --- F.Supp.3d ---, 2020 WL 4197285 (C.D. Cal. July 14, 2020); *Ahlman v. Barnes*, 445 F.Supp. 3d 671 (C.D. Cal. May 26, 2020); *Zepeda-Rivas v. Jennings*, 445 F.Supp. 3d 36 (N.D. Cal., Apr. 29, 2020); *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. Apr. 20, 2020).

23. There are viable options to discharge individuals from Patton to community-based settings—not other congregate settings—in a safe and clinically responsible manner. These options include programs such as Full Service Partnerships / Assertive Community Treatment teams and Supported Housing. Additionally, some individuals have families and other natural supports who are willing and eager to be of help (including in the provision of housing), and these natural supports need to be utilized. If necessary, other possible programs that can facilitate discharge of high-risk patients from DSH-Patton include Assisted Outpatient Treatment and DSH's Conditional Release Program.

24. **Full Service Partnership programs ("FSPs") and Assertive Community Treatment ("ACT") teams** are community-based treatment programs targeted to individuals with serious mental health disabilities who have the highest level of need. Most FSPs use the "ACT model" as the primary mode of service delivery – which includes teams of professionals and peers who deliver a full range of services to clients in their homes or the community. FSP/ACT services may include rehabilitative mental health services, intensive case management, crisis services, substance use disorder treatment, peer support services, and supported employment. These services are available 24 hours per day, 7 days a week, with someone always available to handle emergencies. The ACT and FSP models have proven effective in reducing psychiatric hospitalization and incarceration. For example, an Illinois study found an 85% reduction in inpatient hospital days over

the course of a year for participants in one ACT program.[4]  There are also ACT protocols designed specifically for forensic populations (known as Forensic Assertive Community Treatment, or "FACT") that have achieved substantial reductions in returns to custody.[5]

25.     **Supported Housing** is often paired with FSPs or similarly intensive services.[6]  Supported housing typically includes two components: (1) a rental subsidy for the individual with a mental health disability, and (2) services to support the individual's successful tenancy.  The support services can include case management, training in independent living skills, medication management and/or other services.  Community-based outpatient treatment that includes supported housing has proven extremely effective at improving outcomes for individuals with serious mental illness.

26.     Defendants can also leverage natural supports, such as family members or others who are willing to provide housing or can otherwise assist with a patient receiving mental health care in the community.  For example, Plaintiffs Longstreet, Hernandez, Gluck, and Waldrop have stated that they have family members who would be eager to help with their transition into the community.  Defendants should do everything possible to use these supports to plan and effectuate swift and

---

[4] Gold Award: Helping Mentally Ill People Break the Cycle of Jail and Homelessness The Thresholds, State, County Collaborative Jail Linkage Project, Chicago, 52 PSYCHIATRIC SERVICES 1380 (2001).

[5] J. Steven Lamberti et al., Forensic Assertive Community Treatment: Preventing Incarceration of Adults with Severe Mental Illness, 55 PSYCHIATRIC SERVICES 11, 1285-1293, 1289 (2004); Karen J. Cusack et al., Criminal Justice Involvement, Behavioral Health Service Use, and Costs of Forensic Assertive Community Treatment: A Randomized Trial, 46 Community Mental Health J. 356 (2010).

[6] Housing is included in the "full spectrum of services" provided under FSPs, which includes, but is not limited to "rental subsidies, housing vouchers, house payments, residence in a drug/alcohol rehabilitation program and transitional and temporary housing." 9 C.C.R. § 3620(a)(1)(B)(iii).  California Welfare and Institutions Code section 5892.5 defines "housing assistance" to include rental assistance, operating subsidies, move in costs and utility payments, as well as capital funding to build or rehabilitate housing for homeless or at-risk persons with mental health disabilities.

successful discharge as well as investigate whether other people may have similar familial resources.

27. **Assisted Outpatient Treatment** ("**AOT**") is a civil, legal procedure in which a court can order individuals with serious mental illness to follow a treatment plan in the community. The goal of AOT is to improve access and adherence to behavioral health services and thereby avert relapses, repeated hospitalizations, etc. This program is available for high-risk patients getting released from Patton, if absolutely necessary.

28. **Conditional Release Program ("CONREP")** is a DSH-operated system of community-based services that treat patients whose psychiatric symptoms have been stabilized and are no longer considered to be a danger. As part of CONREP, patients must agree to follow a treatment plan designed by the outpatient supervisor and approved by the committing court. The court-approved treatment plan includes provisions for involuntary outpatient services. Research indicates that patients who participate in CONREP have low rates of reoffending and demonstrate significant improvements in employment, social support, and independence.

29. These options for discharge are in line with DSH's own policies regarding mental health treatment, which make clear that—even without the pressing need created by the pandemic—discharge plans can include release to family, friends, and county mental health facilities, in addition to CONREP.[7]

30. In order to actually effectuate discharge of patients from Patton, however, DSH will need to make a concerted effort to identify and leverage resources to utilize and, if necessary, expand service capacity in the community.

31. Defendants should convene meetings with community stakeholders to

---

[7] While DSH's discharge policy also allows for discharge to skilled nursing facilities and shelters, given the high risk of COVID-19 spreading in congregate facilities, I do not recommend that any individuals be transferred to these types of facilities or to any jails.

identify potential resources, including sites for temporary housing. Defendants should also take specific actions to incentivize community-based agencies to participate in discharge planning, and to provide technical assistance, identification, and remediation.

32. To the extent that expansion of community-based services is necessary, it is important to note that programs such as ACT, FSP, and FSP Housing Support are more cost-effective than institutionalization as it exists in DSH facilities. For example, the RAND Corporation studied the cost of FSP programs in Los Angeles County between 2012 and 2016. It estimated that the program resulted in savings of between $75 million and $90 million in comparison to the government costs incurred for behavioral health inpatient stays.[8] Even if the targeted population in this matter would require additional housing subsidies, the savings over institutionalization would still be substantial.

33. In order to remove patients from the dangers of the institutional setting and conditions at Patton, the following actions should be taken without delay:

    a. Defendants should compile a list of all patients who are over age 50 and/or suffer from an underlying health condition that puts them at high risk of severe illness or death from COVID-19 according to the CDC.

    b. Clinicians should conduct an individualized assessment of every high-risk patient to determine whether they are ready for discharge. In conducting these assessments, clinicians should build on existing systems of care and, wherever possible, recommend and help to facilitate release.

    c. Defendants should investigate and identify existing placement and service capacity in the community, including public and private service

---

[8] McBain, Ashwood, Eberhart, Montemayor, & Azhar, *Evaluating Cost Savings Associated with Los Angeles County's Mental Health Full Service Partnerships*, RAND Corp. https://www.rand.org/content/dam/rand/pubs/research_reports/RR2700/RR2783/RAND_RR2783.pdf.

providers as well as private residences that are clinically appropriate for the patient, to provide the reasonable services and supports necessary to facilitate the safe and effective discharge of patients.

        d.     The Department of State Hospitals, in coordination with other entities, should develop a timely plan to effectuate the safe discharge of high-risk patients as quickly as practicable. As noted above, this plan should include specific actions to incentivize community-based agencies to participate in the planning, to provide technical assistance, identification, remediation.

        e.     Finally, to the extent necessary, the Department of State Hospitals must finalize the discharge for DSH-Patton patients with Public Guardians.

## Conclusion

34. In conclusion, it is my opinion that critical action needs to be taken now to discharge high-risk patients from Patton. Given the extraordinary risks to patients in congregate settings like those at Patton, efforts to utilize and, if necessary, expand community-based options are necessary both to realize the requirements of *Olmstead v. L.C.* 527 U.S. 581 (1999), and to mitigate the elevated and avoidable risks to patients' health and well-being. There is no time to waste.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Silver Spring, Maryland this 12th day of December, 2020.

_____
Elizabeth Jones