SAMANTHA CHOE (SBN: 252002)
schoe@cov.com
ADDISON THOMPSON* (SBN: 330251)
athompson@cov.com
SYLVIA HUANG (SBN: 313358)
syhuang@cov.com
ANNIE SHI (SBN: 327381)
Covington & Burling LLP
415 Mission St., Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-6000

JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 24739)
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)
Kim.Pederson@disabilityrightsca.org
Disability Rights California
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201
*Attorneys for Plaintiffs*

*C.D. California admission application forthcoming

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| RICHARD HART et al., individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>STEPHANIE CLENDENIN, Director of California Department of State Hospitals, in her official capacity et al.,<br><br>　　　　　　Defendants. | Case No. 5:20-cv-1559-JGB-SHK<br><br>**DECLARATION OF HEATHER C. LEUTWYLER, PHD**<br><br>Date:　TBD<br>Time:　TBD<br>Judge:　Hon. Jesus G. Bernal<br>Courtroom:　7D<br><br>Compl. filed:　08/05/2020 |

I, Heather Leutwyler, declare:

1.      I have been retained by Plaintiffs as an expert witness in the above captioned matter.

2.      I have worked for over fifteen years caring for and doing research with people who have a serious mental illness ("SMI").  My work has focused primarily on patients with SMI who are transitioning from inpatient psychiatric hospitals or correctional facilities into community-based mental health facilities in California.  My curriculum vitae is attached as **Exhibit A**.

3.      I have extensive clinical and research experience relating to the components of successful transition from institutional settings to community settings for people with SMI.  I have worked in a variety of community-based mental health facilities that accept patients from institutional settings, from locked mental health treatment facilities to lower-level transitional residential and supportive housing programs.  Part of my work is to help my clients transition from higher to lower levels of care.

4.      I have published studies in peer-reviewed journals, including Aging and Mental Health, the Community Mental Health Journal, Advancing Corrections, and the International Journal of Prisoner Health.  I have received numerous grants to conduct research about people living with SMI, including funding from the National Institute on Aging and the Tobacco-Related Disease Research Program.

5.      In 2020, I published a study titled *Community Transition from the Criminal Justice System for Older Adults with Schizophrenia—a Pilot Study* in Advancing Corrections Journal, which concluded that older adults with schizophrenia may successfully transition into community settings with medication management, housing, and case management.  The study is attached hereto as **Exhibit B**.  In 2017, I published a study titled *Case Management Helps Prevent Criminal Justice Recidivism for People with Serious Mental Illness* in the International Journal of Prisoner Health, which concluded that case management is an essential component of successful transition of

CASE NO.: 5:20-cv-1559 JGB (KKx)
DECLARATION OF HEATHER C. LEUTWYLER, PHD

people with SMI from locked facilities to community settings.  The study is attached hereto as **Exhibit C**.

6.     I have expertise relating to the physical health of people with SMI, including infectious disease in congregate living facilities for people with SMI.  As a board-certified Nurse Practitioner, I provided on-site nursing care to people with SMI living in a 89-bed mental health treatment facility in California.  In that role, I was responsible for disease prevention and the treatment of people with SMI who became sick as viruses spread through the facility each winter.

7.     I have provided on-site nursing care to people with SMI living in transitional residential housing for the past 14 years.  In that role, I provide clinical expertise in diagnosing and treating health conditions, as well as providing disease prevention and health management tools specific to people living with SMI.

8.     My research work also includes determining the factors associated with poor physical health in older adults living with a with SMI and the development and testing of interventions to improve health outcomes.  I am currently conducting a pilot program to examine the feasibility and efficacy of interventions for smoking cessation in adults with SMI.  I am also the clinical mentor for the University of California, San Francisco ("UCSF") Street Nursing Project funded by the Cigna Foundation and the Rita & Alex Hillman Foundation, which provides outreach and medical referrals for people experiencing homelessness.

9.     I am a tenured Associate Professor and Vice-Chair in the Department of Physiological Nursing at the UCSF School of Nursing.  I am also Associate Director for the UCSF Hartford Center of Gerontological Nursing Excellence.  I hold a PhD in Nursing from UCSF.  My doctoral dissertation focused on the poor physical health of older adults with schizophrenia.  I also hold a Bachelor of Science in Neuroscience, a program that provided a strong foundation for understanding the neurobiology of mental illness.

## Summary of Documents Reviewed

10.     In order to complete this declaration, I reviewed the clinical records of 12 Department of State Hospital ("DSH") patients, including the clinical records of all Plaintiffs named in this action.  These records included treatment plans written by the patients' psychiatrist and psychologist, progress notes, and assessments and reports from the treatment team.  The treatment teams included registered nurses, social workers, rehabilitation therapists, psychologist, and psychiatrists.

11.     I also reviewed other documents, including the Complaint filed on August 5, 2020; declarations of five class members; medical literature and policy recommendations relating to COVID-19 and the heightened health risks for people with SMI; and research relating to mental health services and programs in California.

## The Congregate Setting of DSH Facilities Puts the Large Number of DSH Residents with High-Risk Factors for Severe Illness or Death from Covid-19 in Enormous Peril

12.     Based on my experience working with people with SMI in various treatment settings, my research, and my review of relevant materials for this case, it is my strong opinion that there are hundreds of DSH-Patton patients who are at grave risk of severe illness or death if infected with COVID-19.

13.     DSH has estimated that nearly 25% of its patient population is age 60 or older, a factor that puts people at increased risk of severe illness or death if they contract COVID-19.  This translates to approximately 375 DSH-Patton patients that are over age 60, based on an estimated patient population of 1,500.[1]  The Centers for Disease Control and Prevention ("CDC") estimates that eight out of ten deaths in the United States have

---

[1] According to the DSH website, DSH-Patton operates approximately 1,527 beds. *Department of State Hospitals – Patton*, DEP'T OF STATE HOSPITALS, https://www.dsh.ca.gov/Patton/index.html (last visited Dec. 9, 2020).

been in adults 65 years old or older.[2]

14.     In addition, it is almost certain that hundreds of DSH-Patton patients have medical conditions that put them at high risk of serious illness or death if infected with COVID-19.  My experience and extensive research in the field confirm that people with SMI tend to have multiple medical comorbidities secondary to their psychiatric treatment, including many comorbidities that have been identified by the CDC as increasing the risk of severe illness from COVID-19 infection.[3]  For example, people with SMI are more likely than the general population to be obese and to have obesity-related medical conditions, such as type 2 diabetes.[4]  People with SMI are also at higher risk for coronary heart disease, vascular disease, congestive heart failure, and hypertension.[5]

15.     The fatality rate of COVID-19 infection for people with these medical conditions is by some estimates as high as 20%.

---

[2] *People at Increased Risk – Older Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Dec. 9, 2020).

[3] *People at Increased Risk – People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 9, 2020).

[4] *See, e.g.*, Marc De Hert, et al., *Physical Illness in Patients with Severe Mental Disorders: Prevalence, Impact of Medications and Disparities in Health Care*, 10(1) WORLD PSYCHIATRY 52-77 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3048500/; Davy Vancampfort, et al., *Risk of metabolic syndrome and its components in people with schizophrenia and related psychotic disorders, bipolar disorder and major depressive disorder: a systematic review and meta-analysis*, 14(3) WORLD PSYCHIATRY 339-347 (2015), https://pubmed.ncbi.nlm.nih.gov/26407790/.

[5] *See, e.g.*, Christoph U. Correll, et al., *Prevalence, Incidence and Mortality from Cardiovascular Disease in Patients with Pooled and Specific Severe Mental Illness: A Large-Scale Metanalysis of 3,211,768 patients and 113,383,368 Controls* published 16(2) WORLD PSYCHIATRY 163-80 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5428179/; Christoph U. Correll, et al., *Findings of a U.S. National Cardiometabolic Screening Program Among 10,084 Psychiatric Outpatients*, 61(9) PSYCHIATRIC SERVICES 892 (2010), https://pubmed.ncbi.nlm.nih.gov/20810587/.

16.     Data also show that people from racial or ethnic minority groups, including people from Black, Indigenous, and Latinx populations, are at increased risk for illness or death due to COVID-19.[6]

17.     The individual Plaintiffs in this case have multiple risk factors that put them in danger of dying from COVID-19.  These factors are typical of the comorbidities I see in my patients with SMI.

      a.     **Mr. Longstreet** is an African American man with multiple comorbidities, including hypertension, high cholesterol, and high Body Mass Index.

      b.     **Mr. Hernandez** is a Latino man with multiple comorbidities, including coronary artery disease, type 2 diabetes mellitus, hypertension, hyperlipidemia, and obesity, with a Body Mass Index of 38.1.

      c.     **Mr. Waldrop** has multiple comorbidities, including type 2 diabetes and severe obesity, with a Body Mass Index of 57.8, and requires a CPAP machine to treat his sleep apnea.

      d.     **Mr. Gluck** has multiple comorbidities, including type 2 diabetes, hypertension and obesity, with a Body Mass Index of 32.

18.     The American Medical Association, the CDC, and the medical literature recommend the following infection control measures to protect high-risk patients from COVID-19 in congregate settings like DSH-Patton: social distancing; protection of high-risk patients, including through release as necessary; staff cohorting to reduce spread within the facility; consistent use of personal protective equipment; screening and testing; and hygiene and sanitation.

19.     Social distancing is one of the most important components of infection

---

[6] *COVID-19 Hospitalization and Death by Race/Ethnicity*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last visited Dec. 9, 2020).

control and requires patients and staff to maintain at least six feet between themselves and others at all times.

20.     The DSH-Patton patient declarations I reviewed affirmatively demonstrate how social distancing is not possible in bedrooms, bathrooms, and common areas at DSH-Patton.  Approximately 50 patients reside in each unit and share one bathroom. Patients have been required to eat in communal dining areas.  According to the patient declarations I reviewed, some of the bedrooms are so small that patients are able to touch the adjacent beds while sitting or lying on their own beds.  In this type of environment, maintaining adequate physical distance and ensuring high touch areas are frequently cleaned would be incredibly challenging, if not impossible.

21.     Due to these crowded living conditions, patients at DSH-Patton are at increased risk of contracting COVID-19 as compared to community mental health facilities and transitional housing programs, which have patient populations that are far smaller than DSH-Patton.  In contrast to the units at DSH-Patton that crowd 30, 40, or even 50 patients together, community-based programs typically house between five and twenty patients, often with only one or two patients per room.

22.     The Substance Abuse and Mental Health Services Administration ("SAMHSA") is the federal agency charged with leading public health efforts in the area of mental and behavioral health nationwide.  It is housed within the U.S. Department of Health and Human Services.  Due to the high prevalence of CDC-identified risk factors in the SMI population, SAMHSA has issued guidance recommending that patients with SMI be treated in outpatient community placements to the greatest extent possible during the pandemic, and that inpatient psychiatric treatment be reserved for patients whose conditions are "life threatening."[7]  The SAMHSA guidance recognizes that community-

---

[7] SAMHSA, *Considerations for the Care and Treatment of Mental and Substance Use Disorders in the COVID-19 Epidemic* (Revised May 7, 2020), https://www.samhsa.gov/sites/default/files/considerations-care-treatment-mental-substance-use-disorders-covid19.pdf; *see also* SAMHSA, *Covid19: Interim Considerations for State Psychiatric Hospitals* (May 8, 2020),

based programs provide a critical resource for treating patients during the pandemic.

23.     Similarly, the American Medical Association ("AMA") has called for "compassionate release" or "medical release" of people living in correctional facilities who have serious medical conditions and/or advanced age, in order to protect them from the heightened risk of COVID-19 infection inside locked facilities.[8]

24.     The Mental Health Services Oversight and Accountability Commission ("MHSOAC") is an independent state agency that was created to provide oversight, accountability and leadership to California's mental health system.  MHSOAC has found that people with mental health conditions, including those with SMI, are at higher risk of contracting COVID-19 if they live in confined psychiatric facilities.  In addition, MHSOAC recognizes that people with SMI face a higher risk of illness or death if the virus is contracted, due to medical comorbidities and a high susceptibility to stress caused by the pandemic, including from quarantine and isolation.  MHSOAC recommends that people with mental health needs, including those with SMI, can and should be safely and effectively treated in a community setting to the greatest extent possible.[9]

25.     The Judge David L. Bazelon Center for Mental Health Law ("Bazelon Center"), a nationally recognized mental health advocacy organization, has called on states, localities, and hospitals to take "aggressive action to reduce the number of people confined in psychiatric hospitals" during the pandemic.[10]  To facilitate a decrease in the

---

https://www.samhsa.gov/sites/default/files/covid19-interim-considerations-for-state-psychiatric-hospitals.pdf.

[8] American Medical Association, *AMA policy calls for more COVID-19 prevention for congregate settings* (Nov, 17, 2020), https://www.ama-assn.org/press-center/press-releases/ama-policy-calls-more-covid-19-prevention-congregate-settings.

[9] Mental Health Services Oversight and Accountability Commission, *Together We Can: Reducing Criminal Justice Involvement for People with Mental Illness* 26 (2017), https://mhsoac.ca.gov/sites/default/files/2020-07/ADA%20REPORT_MHSOAC_Crim_Just_MH_Report_Remediated0720.pdf.

[10] Judge David L. Bazelon Center for Mental Health Law, *During the Pandemic, States and Localities Must Decrease the Number of Individuals In Psychiatric Hospitals, By Reducing Admissions and Accelerating Discharges* (Apr. 4, 2020), http://www.bazelon.org/wp-content/uploads/2020/04/4-15-20-BC-psych-hospitals-

psychiatric inpatient population, the Bazelon Center has called for "accelerat[ion]" of discharges, increased "support of community providers of outpatient mental health treatment," and increased "access to housing" to "meet the needs of people with [SMI]."[11]

### There are a Range of Step-Down and Community Placements that Can Safely and Effectively Serve DSH Residents with COVID-19 Risk Factors.

26.     There are a range of step-down and community placements within California's community mental health system that can safely and effectively serve many DSH residents, including many who are at elevated risk very severe COVID-19 illness. Through effective individualized assessments, a discharge/treatment planning team can identify appropriate housing and services that are tailored to individual patient needs for many DSH-Patton residents.  Given the extraordinary health risk to DSH-Patton patients under current conditions, these assessments are critically necessary to facilitate implementation of SAMHSA, AMA, and MHSOAC guidance to move high-risk patients out of DSH-Patton congregate settings.

27.     There are four major components of successful transition from inpatient care to step-down or community-based mental health treatment, which in my opinion can be applied to safely move DSH-Patton residents into settings with reduced COVID-19 infection risk: (1) development of a Wellness Recovery Action Plan® ("WRAP"); (2) appropriate transitional housing with support services tailored to the individual's needs; (3) Assertive Community Treatment ("ACT"); and (4) access to appropriate healthcare and mental health services in the community.

a.     **Wellness Recovery Action Plan (WRAP)**.  The WRAP is an evidence-based, peer-led, behavioral health self-management intervention used to

_____

statement-FINAL.pdf.

[11] *Id.*

prepare patients for transition to a community placement.[12]  Development of the WRAP provides patients with individualized wellness tools and teaches capacity building, disease management, and crisis aversion strategies that they can employ once in the community.  Studies have shown that consumers of WRAP are better able to take responsibility for their own wellness and have significantly increased rates of success living in community settings.[13]

b.    Development of a WRAP is standard practice for people preparing to discharge from DSH.  WRAPs are developed by the patient in close coordination with DSH staff, including the patient's psychiatrist and social workers.  Familiarity with the WRAP is one of the primary ways that DSH evaluates a patient's readiness for community placement.

c.    During the pandemic, WRAPs should be updated to consider the physical and mental health risks of being confined at DSH-Patton, and should include affirmative and achievable steps that facilitate an individual's step-down to a community placement.

d.    **Appropriate Transitional Housing with Support Services.** Transitional housing is an evidenced-based model for promoting social rehabilitation, integration, and self-care.  Many programs provide multidisciplinary treatment teams on-site.  Staff have access to patients' WRAPs and help them to implement the plan in the community.

e.    Studies have shown that transitional housing with appropriate

---

[12] Judith A. Cook, et al., *Results of a randomized controlled trial of mental illness self-management using wellness recovery action planning*, 38(4) SCHIZOPHRENIA BULLETIN 881 (2012), https://academic.oup.com/schizophreniabulletin/article/38/4/881/1868636.

[13] Judith A. Cook, et al., *Developing the evidence base for peer-led services: Changes among participants following Wellness Recovery Action Planning (WRAP) education in two statewide initiatives*, 34(2) PSYCHIATRIC REHABILITATION JOURNAL 113 (2010), https://doi.apa.org/doiLanding?doi=10.2975%2F34.2.2010.113.120.

supportive services can greatly reduce rates of hospitalization, incarceration and use of crisis services.  One program reduced incarceration by 50%, shelter use by 88%, hospitalization episodes by 71%, and crisis response episodes by 71%.[14]

f.    Due to the influx of funding from Mental Health Services Act ("MHSA") and related programs, California offers a variety of programs along a continuum of services that can safely and effectively serve many DSH residents. These programs are provided in a range of settings depending on a patient's needs and circumstances, from highly restrictive locked settings with on-site services to programs with lower-levels of restrictiveness and intensity of care.  This range of placements provides a menu of options to help each patient succeed.

g.    For example, I previously served as a Nurse Practitioner at Canyon Manor Mental Health Rehabilitation Center, a highly restrictive mental health residential treatment facility with intensive on-site care.  Canyon Manor operates 89 beds over two acres of property, with one to two patients per room and outdoor space for eating and relaxing.  I currently work with various transitional residential programs through the Progress Foundation, which typically operate five to fifteen beds per facility.  These settings provide safe, structured, social rehabilitation residences that are staffed by highly trained counselors 24-hours a day, with daily contact by Nurse Practitioners and other providers as needed.

h.    DSH discharge plans and WRAPs should include consideration of these transitional settings to meet individualized needs while safeguarding high-risk patients during the pandemic.  To facilitate successful transition, transitional programs should be provided in conjunction with mental health and support services, including ACT and ongoing mental health appointments, as discussed below.

---

[14] Bazelon Center for Mental Health Law, *A Way Forward: Diverting People with Mental Illness* 4-5 (2014), http://www.bazelon.org/wp-content/uploads/2017/11/A-Way-Forward_July-2014.pdf.

     i.     **Assertive Community Treatment (ACT)**.  ACT is an evidence-based treatment model that involves a multidisciplinary team providing individualized assessment and comprehensive support services.  ACT is designed for individuals transitioning from an institutional to community setting and has been shown to reduce inpatient hospitalizations and to decrease recidivism.[15]

     j.     Case managers are an essential part of the ACT team and play a critical role in coordinating mental health services, healthcare, housing, transportation, employment, social relationships, and community participation.  Case managers help patients with activities of daily living, access to technology and support services, attending support groups, and navigating appointments.

     k.     Case management also plays a key role in identifying inadequately treated mental illness and preventing recidivism.  Case managers are often the first to notice when a patient starts to experience increased symptoms or reduced function, and can intervene early to help with symptom management, access appropriate services, and prevent hospitalization.

     l.     **Access to healthcare and mental health services in the community.**  DSH must ensure that a patient's physical and mental health issues are being managed.  Pre-discharge assessments must ensure a patient's symptoms are relieved and that they have access to medications.  In addition, DSH social workers can help patients work on community integration prior to re-entry, including help applying for government benefits.

     m.     Once in the community, patients must have continued access to healthcare and mental health services.  Providers must frequently re-assess the patient's physical and mental health, including symptom and medication

---

[15] Thomas Marquant, et al., *Forensic Assertive Community Treatment: A Review of the Literature*, 52(8) COMMUNITY MENTAL HEALTH J. 873 (2016), https://link.springer.com/article/10.1007%2Fs10597-016-0044-0.

management.  These services may be provided either on-site at the transitional housing placement or at outpatient visits.  ACT or transitional housing support staff must ensure that patients attend appointments and take medications.

## A Significant Number of DSH Residents Can Be Safely and Effectively Discharged to an Alternative Placement with Appropriate Supportive Services

28.     Based on my experience working with SMI patients and my review of DSH-Patton patient records, many DSH patients can safely and effectively transition to less restrictive settings with appropriate support services.

29.     DSH patients' discharge and treatment plans reveal that while safe and effective discharge is feasible for many patients, not enough has been done to actualize discharge goals and prioritize high-risk patients during the pandemic.  Discharge planning continues to rigidly apply pre-pandemic criteria without considering the physical and mental health risks of continued confinement at DSH-Patton.  Even high-risk patients that are documented as having a viable WRAP and a plan for step-down community treatment face life-threatening delays in discharge.

a.     **Ervin Longstreet.**  DSH identified Mr. Longstreet as appropriate for discharge in July 2020.  However, he continues to be confined at DSH-Patton and has faced multiple delays to discharge that have put him at an unreasonable and extreme risk of illness from COVID-19.  I am informed that he tested positive for COVID-19 on or about December 7, 2020.

b.     DSH initially recommended Mr. Longstreet for transfer to Sylmar Health & Rehabilitation Center ("Sylmar"), a smaller step-down mental health treatment facility, in July 2020.  Sylmar declined to admit Mr. Longstreet on July 15, 2020.  On September 28, 2020, DSH again recommended Mr. Longstreet for transfer to Sylmar.  Although it's been over five months since DSH recommended him for discharge, he still has not been transferred out of the facility.

c.     There is no clinical justification for these delays, and there is no

indication that DSH attempted to place Mr. Longstreet at an alternative facility that could meet his needs.  Mr. Longstreet has multiple comorbidities that put him at significant risk if he is exposed to COVID-19, but his DSH records do not appear to contain any meaningful consideration of those risks or the need to transfer him to a less-congregate setting to protect him from the spread of COVID-19 inside DSH-Patton.

d.      With appropriate supports, Mr. Longstreet can be safely and effectively treated in a structured transitional setting.  DSH has determined that "Mr. Longstreet's risk for future violence is rated Low at this time."  According to his records, Mr. Longstreet has a WRAP in place that he can discuss "from memory" and has been "observed translating this plan into action within the hospital."  He understands his symptoms, triggers, and self-management goals.  He understands his medication regime and has completed group programming, although I understand that group programming is no longer available due to COVID-19 restrictions.

e.      Although he fears for his life, Mr. Longstreet has coped well with the stressors presented by the pandemic, managing stress by "reading, listening to music, and meditating."  Records from July, August, and September 2020 state that Mr. Longstreet is in "stable condition," has "no worsening or exacerbations in mental health problems," is "compliant with his medications" with no side effects reported, and presents "no behavioral issues."

f.      I have seen patients like Mr. Longstreet do well in structured transitional community placements with appropriate support services and ACT.  Transitional housing and ACT/case management staff can help Mr. Longstreet implement his WRAP in the community, support medication and symptom management, navigate appointments, and ensure access to therapy and healthcare.  Mr. Longstreet has stated that he wants to find a sponsor and attend Alcoholics

Anonymous meetings after he leaves DSH.

g.    Mr. Longstreet's success will be aided by family support and employment goals.  He has maintained connection with family members who have expressed their willingness to assist him, including by providing housing and support.  His records from September 2020 state that he was planning to send a cake, flowers, and a card to his daughter for her birthday and wants to "be a part of his children and grandchildren's lives."  He also holds a job within DSH-Patton and seeks to find employment in the community, which will assist in community integration.

h.    **Aldo Hernandez.**  DSH evaluated Mr. Hernandez for discharge through the Conditional Release Program (CONREP) on March 31, 2020.  That evaluation indicates he has met major treatment goals for discharge.  However, he continues to be confined at DSH-Patton and is at an unreasonable and extreme risk of illness if he is infected with COVID-19.

i.    With appropriate supports, Mr. Hernandez can be safely and effectively transitioned to a structured living environment that presents a lower risk of COVID-19 infection.

j.    According to his records, Mr. Hernandez has a WRAP in place and is documented as being able to speak about it from memory.  He understands his symptoms, triggers, and self-management goals.  He understands and is adhering to his medication regime and states that he is committed to maintaining sobriety.  Prior to the COVID-19 pandemic, Mr. Hernandez was actively participating in group programming, although I understand that group programming is no longer available due to COVID-19 restrictions.  He states that he will accept supervision and support by the San Bernardino County CONREP team to assist with community integration.

k.    Mr. Hernandez has multiple comorbidities that put him at significant

risk if he is exposed to COVID-19, but his DSH records do not appear to contain any meaningful consideration of those risks or the need to transfer him to a less-congregate setting to protect him from the spread of COVID-19 inside DSH-Patton.

l.      I have seen patients like Mr. Hernandez do well in structured transitional community placements with intensive support services, regular visits by Nurse Practitioners, and ACT.  Transitional housing and ACT/case management staff can help Mr. Hernandez implement his WRAP in the community, support medication and symptom management, navigate appointments, and ensure access to therapy and healthcare.  Mr. Hernandez would benefit from a program that can help him build skills related to activities of daily living and support his goals of losing weight and maintaining his physical health.

m.      Mr. Hernandez's success will be aided by family support and his employment goals.  Mr. Hernandez's clinical records indicate that he has maintained relationships with a network of family members who live in Southern California and appear to be very supportive of him.  He has also held employment in housekeeping and IT roles at DSH-Patton.  He states that he wants to earn his GED and would like to volunteer or work in food service.  The prospect of employment for Mr. Hernandez, even if an un-paid role, will aid with community integration.

n.      **Richard Hart.**  DSH identified Mr. Hart as a candidate for discharge in February 2020.  However, he continued to be confined at DSH-Patton until September 2020, when he was discharged to a community placement.  This seven-month delay in his discharge put him at an unreasonable and extreme risk of infection and illness from COVID-19.  There is no clinical explanation for this delay.  DSH evaluators had identified him as having a "low" risk of violence, he understood his WRAP, attended group programming, and had coping and self-

management skills.  I have seen patients like Mr. Hart succeed in transitional residential programs with appropriate support services.

     o.     Mr. Hart has multiple comorbidities that put him at significant risk if he is exposed to COVID-19, including recent lung cancer and Chronic Obstructive Pulmonary Disease, but his DSH records do not appear to contain any meaningful consideration of those risks or the need to transfer him to a less-congregate setting to protect him from the spread of COVID-19 inside DSH-Patton.  His discharge in September 2020 was long overdue.

     p.     **Albert Aleman.**  Mr. Aleman's records indicate he has met major treatment goals for discharge.  He has a WRAP, understands his symptoms, triggers, and self-management goals.  He adheres to his medication regime, is actively engaged in treatment, and has an employment history at DSH-Patton.  Due to multiple COVID-19 risk factors, Mr. Aleman's continued confinement at DSH-Patton puts him at an unreasonable and extreme risk of illness if he is infected with COVID-19.  With appropriate supports, Mr. Aleman can be safely and effectively transitioned to a structured living environment with that presents a lower risk of COVID-19 infection.

     q.     **James Moore.**  Mr. Moore's records indicate he has met major treatment goals for discharge.  He has a WRAP, understands his symptoms, triggers, and self-management goals.  He adheres to his medication regime, is actively engaged in treatment, and has insight into his mental illness.  As a trained magician, he performs for other patients and staff and wants to pursue employment in that field after discharge.  Due to multiple COVID-19 risk factors, Mr. Moore's continued confinement at DSH-Patton puts him at an unreasonable and extreme risk of illness if he is infected with COVID-19.  With appropriate supports, Mr. Moore can be safely and effectively transitioned to a structured living environment that presents a lower risk of COVID-19 infection.

## Deficiencies in DSH's Processes Prevent Eligible Patients from Timely Transitioning to Safe and Effective Community Placements

30.     Based on my review of DSH-Patton patient records, several deficiencies in DSH's processes appear to prevent eligible patients from timely transitioning to safe and effective community placements.

31.     **Failure to consider COVID-19 risk and to seek out new alternative placements.**

a.     A major barrier to discharge or transfer of patients at high risk for complications due to COVID-19 is DSH's use of the same factors for discharge or transfer that were used prior to the pandemic.  Although many patients suffer from multiple comorbidities that make them extremely vulnerable if infected with COVID-19, none of the discharge assessments I reviewed considered that fact in determining when and how they could be transitioned out of DSH-Patton.

b.     In addition, DSH failed to accelerate or modify the discharge process for high-risk patients even after DSH identified them as ready for discharge, including Mr. Longstreet and Mr. Hart.

c.     Given the risk of severe illness or death posed by COVID-19, DSH assessments must be adjusted to account for patients' health risks, including through acceleration of discharge planning for patients who may be safely and effectively treated in transitional programs.  DSH must take immediate action to align with SAMHSA, AMA, and MHSOAC guidance calling for the transfer of high-risk patients out of congregate living facilities on an expedited basis.

d.     With this finding, I do not suggest that DSH can or should ignore any legal requirements for the discharge of patients held pursuant to a civil or forensic commitment. What I do suggest, strongly, is that DSH's "business-as-usual" processes are deficient insofar as they fail to ensure timely discharge of patients who do meet clinical and legal requirements for discharge, including through

meaningful and current review of each patient's condition and placement/service options that will meet their needs.

32. **Undue and disproportionate emphasis on the committing offense or failed placement.**

a. In DSH's review system, a person's committing offense may pose a barrier to discharge consideration, even if the offense occurred many years ago while the patient did not have access to mental health treatment and medication, and even if the patient is currently meeting DSH treatment goals.

b. In contrast, transitional programs assess the current risks associated with living in a community placement. Any current risks can often be addressed through transfer to a transitional program tailored to the individual's needs, with an appropriate level of restrictiveness, care, and support services.

33. **Treatment and programming not offered at DSH-Patton.**

a. The pandemic's adverse impact on treatment programming at DSH-Patton has created a terrible Catch-22 for patients. DSH-Patton patients are supposed to work towards and achieve certain treatment goals – including completing particular programming offerings – in order to be deemed discharge-ready. But they cannot make progress towards treatment goals because many of these DSH programs have been cancelled or restricted during the pandemic. DSH discharge assessments should account for the fact that these patients are prevented from progressing towards discharge through no fault of their own, and how treatment programming can be appropriately provided in alternative settings that do not pose the same extreme risks of COVID-19 infection as exist in DSH-Patton.

b. Similarly, all visitation of family and friends at DSH-Patton has been suspended indefinitely. Not only does this have negative mental health implications for DSH-Patton patients, it also puts a strain on family support networks that may be integral to discharge planning and readiness, making

successful transition to the community more difficult.

c.     Additionally, the records I reviewed do not contain meaningful consideration of the mental health implications relating to continued confinement at DSH-Patton during the pandemic.  As MHSOAC recognizes, quarantine and isolation in psychiatric hospitals, as well as the stress associated with the pandemic, can lead to and/or exacerbate mental health conditions.  It is clear from the materials I have reviewed that DSH-Patton patients are experiencing enormous stress based on their being held in DSH-Patton's crowded units where COVID-19 is rampant, without any way to protect themselves and without DSH's taking adequate steps to get them to a safer place.

## Provision of Safe and Effective Alternative Placements for High-Risk DSH Patients is Achievable

34.     The goal of providing safe and effective alternative placements to high-risk DSH patients is achievable.  I have treated numerous people with SMI in community settings, including people who were previously incarcerated or living in locked psychiatric facilities.  I have also treated numerous people with SMI in community settings who have significant support needs, including needs related to social functioning and physical and mental health.  These patients can do well and succeed in community placements with adequate and appropriate support services.

35.     The four components of successful transition from institutions to community treatment—WRAP, transitional housing, ACT, and access to appropriate healthcare—are evidenced-based treatment models that are proven to have positive outcomes for patients and to reduce recidivism and re-hospitalization.

36.     These treatment models already exist in programs across the state, and have been providing safe and effective treatment to Californians with SMI for years.  In 2004, California voters passed Proposition 63, enacted as the Mental Health Services Act (MHSA), which has generated approximately $15 billion for mental health services in

California and has funded community mental health and ACT programs across the state.[16]  More recently, millions of dollars in state and federal funding has become available for community services and transitional housing programs during the pandemic.[17]

37.    These proven treatment tools can and should be replicated for DSH-Patton patients, either with monies already available to the system or through additional resources.  Now is the critical moment to extend these programs to DSH patients, who face unacceptable health risks if they remain in congregate facilities like DSH-Patton.

38.    Provision of these programs to DSH patients aligns with guidance from the AMA, SAMHSA, MHSOAC, and the Bazelon Center, which calls on public agencies to expeditiously transfer high-risk individuals out of congregate living facilities and to provide treatment in community programs to the greatest extent possible.  The AMA, SAMHSA, MHSOAC, and the Bazelon Center have concluded that community-based treatment is not only viable, it is necessary to protect patients from the physical and mental health risks posed by COVID-19 in congregate facilities.

39.    Despite clear guidance from medical and mental health authorities, DSH has failed to take adequate steps to achieve the transfer or discharge of high-risk patients like Mr. Longstreet, Mr. Hernandez, Mr. Hart, Mr. Aleman, and Mr. Moore, who can be effectively served in less congregate, less risky settings.

40.    The problem of DSH involuntarily confining people who are ready for discharge predates the pandemic.  A report by the Auditor of the State of California

---

[16] Mental Health Services Oversight and Accountability Commission, *Prop 63/MHSA: The Act*, http://mhsoac.ca.gov/about-us/prop63mhsa/act (last visited Dec. 9, 2020).

[17] *See, e.g.*, Office of Gov. Gavin Newsom, *Governor Newsom Announces Emergency Allocation of $62 Million to Local Governments to Protect People Living in Project Roomkey Hotels* (Nov. 16, 2020), https://www.gov.ca.gov/2020/11/16/governor-newsom-announces-emergency-allocation-of-62-million-to-local-governments-to-protect-people-living-in-project-roomkey-hotels/; Judge David L. Bazelon Center for Mental Health Law, *During the Pandemic, States and Localities Must Decrease the Number of Individuals In Psychiatric Hospitals, By Reducing Admissions and Accelerating Discharges* 2 (Apr. 4, 2020), http://www.bazelon.org/wp-content/uploads/2020/04/4-15-20-BC-psych-hospitals-statement-FINAL.pdf..

identified at least 138 DSH-confined patients who DSH had found appropriate for discharge but had not yet been discharged to lower levels of care.[18]  In August 2020, DSH sent letters to California counties to discuss patients who were "prepared to stepdown into placement in the community" but had seen no progress towards discharge. The risks related to mass COVID-19 transmission in DSH demand that all possible steps be taken to get these patients out of harm's way.  Notably, DSH's August 2020 letters were apparently limited to patients civilly committed under the Lanterman-Petris-Short Act.  It is apparent from my review that there are a sizeable number of forensically committed high-risk patients at DSH-Patton whose discharge is likewise overdue.

41.    DSH can safely effectuate discharges even in the midst of the pandemic.  To the extent quarantining is deemed necessary to prevent transmission from inside the facility, DSH can utilize COVID-19 quarantine spaces currently in operation or placement in hotels or college dormitories, as other agencies across the state have done through Project Roomkey and similar programs.[19]  Any need to quarantine does not and should not prevent eligible patients from discharging to a community placement.

42.    The community system has adapted to meet the challenges posed by the pandemic.  Therapy and group programming is being offered through expansion of Telehealth services, which employ various technologies and modalities to provide patient care safely during the pandemic.[20]  One-on-one therapy and group sessions are being offered outside or online as appropriate.  Case managers and transitional housing staff are providing support and encouragement to enable patients to access technologies.

---

[18] Auditor of the State of California, *Lanterman-Petris-Short Act* (July 2020), *available at* https://www.auditor.ca.gov/pdfs/reports/2019-119.pdf.

[19] Project Roomkey/Housing and Homelessness COVID Response, CAL. DEP'T OF SOC. SERV., https://www.cdss.ca.gov/inforesources/cdss-programs/housing-programs/project-roomkey (last visited Dec. 9, 2020).

[20] Using Telehealth to Expand Access to Essential Health Services during the COVID-19 Pandemic, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/hcp/telehealth.html (last visited Dec. 9, 2020).

43.     In conclusion, the need to transfer medically high-risk patients out of institutional settings has never been more urgent.  Large numbers of DSH-Patton patients are at risk of severe illness or death if infected with COVID-19.  These patients face unacceptable risk of infection due to the crowded living conditions at DSH-Patton and the outbreaks of COVID-19 in the facility.  Although many discharge plans require approval from state court, there are concrete steps that DSH can take right now to effectuate discharge or transfer of high-risk patients.  Through effective individualized assessments, DSH can identify appropriate supports that are tailored to patients' needs.  These supports, which include WRAP, transitional housing, ACT, and appropriate healthcare, will permit many DSH-Patton patients to be safely and effectively treated in step-down community placements.  Now is the critical moment to provide these programs to high-risk patients at DSH-Patton.  Failure to meet this urgent need will have dire implications for the health of DSH-Patton patients, DSH staff, and the healthcare capacity of surrounding communities.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Pacifica, California, on December 10, 2020.

_____

Heather C. Leutwyler, PhD

CASE NO.: 5:20-cv-1559 JGB (KKx)
DECLARATION OF HEATHER C. LEUTWYLER, PHD