SAMANTHA CHOE (SBN: 252002)
schoe@cov.com
ADDISON THOMPSON* (SBN: 330251)
athompson@cov.com
SYLVIA HUANG (SBN: 313358)
syhuang@cov.com
ANNIE SHI (SBN: 327381)
Covington & Burling LLP
415 Mission St., Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-6000

JENNIFER STARK (SBN: 267062)
Jennifer.Stark@disabilityrightsca.org
AARON FISCHER (SBN: 24739)
Aaron.Fischer@disabilityrightsca.org
ANNE HADREAS (SBN: 253377)
Anne.Hadreas@disabilityrightsca.org
SARAH GREGORY (SBN: 303973)
Sarah.Gregory@disabilityrightsca.org
KIM PEDERSON (SBN: 234785)
Kim.Pederson@disabilityrightsca.org
Disability Rights California
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201

*Attorneys for Plaintiffs*

\* *C.D. California admission application forthcoming*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| RICHARD HART et al., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>STEPHANIE CLENDENIN, Director of California Department of State Hospitals, in her official capacity et al.,<br><br>        Defendants. | Case No. 5:20-cv-1559-JGB-SHK<br><br>**DECLARATION OF ANNE HADREAS**<br><br>Date:   TBD<br>Time:  TBD<br>Judge:  Hon. Jesus G. Bernal<br>Courtroom: 7D<br><br>Compl. filed:  08/05/2020 |

I, Anne Hadreas, hereby declare:

1. I am an attorney admitted to practice before the courts of the State of California and before this Court. I am an Associate Managing Attorney at Disability Rights California and co-lead counsel for Plaintiffs in this litigation. If called as a witness, I could and would competently testify to the facts stated herein, all of which are within my personal knowledge and experience.

## The Department of State Hospitals and Patton State Hospital

2. Through my job at Disability Rights California, I regularly represent individuals with serious mental illness, including individuals being held at California's State Hospitals. As the protection and advocacy system for the state of California, created by federal and state law, Disability Rights California has the authority and duty to protect the rights and interests of people with disabilities, including psychiatric disabilities. This work includes investigating incidents of suspected abuse and neglect, pursuit of administrative, legal, and other appropriate remedies to protect the rights of people with disabilities, and providing information, referral and training concerning programs and services addressing the needs of people with disabilities. 42 U.S.C. § 10801 *et seq;* Cal. Welf. & Inst. Code § 4900 *et seq*.

3. I have visited all California Department of State Hospitals ("DSH") facilities, including Patton State Hospital ("DSH-Patton"), to interview clients, monitor conditions, and investigate allegations of abuse, neglect, and violations of patients' rights. I have also conducted legal clinics in two of the State Hospitals and interviewed and/or corresponded with hundreds of individuals held at the State Hospitals.

4. Based on my interviews and correspondence with DSH-Patton residents in addition to my own experience visiting DSH-Patton, I know that DSH-Patton is a dense, congregate living environment where patients live in close proximity to each other. Units typically have dozens of patients who share common areas, including bathrooms, dining halls, and day rooms.

5. In the course of my work on this case, I regularly refer to the DSH website for information. Attached as **Exhibit A** are true and correct copies of webpages maintained by DSH, showing that Defendant Stephanie Clendenin is Director of DSH and oversees the management of California's State Hospital system. This includes the provision of mental health services to patients at California's five state psychiatric hospitals: DSH-Patton, DSH-Atascadero, DSH-Coalinga, DSH-Metropolitan (in Los Angeles County), and DSH-Napa. The webpages also show that Defendant Janine Wallace (collectively with Defendant Clendenin, "Defendants") oversees the management of DSH-Patton as its Executive Director. The webpages are available at https://www.dsh.ca.gov/About_Us/Directors_Message.html and https://www.dsh.ca.gov/Patton/Contact_Information.html.

6. Attached as **Exhibit B** are true and correct copies of webpages maintained by DSH that describe the facilities at DSH-Patton. These webpages show that DSH-Patton currently operates approximately 1,527 beds and employees approximately 2,380 people. DSH-Patton has three security compounds where the individuals served are assigned to units within five large buildings. Within the units, patients are assigned to a small room, which is similar to a college dorm. There are generally around 3-5 patients per room. All units have a large living room, with chairs and tables and a television. The webpages are available at https://www.dsh.ca.gov/Patton/index.html and https://www.dsh.ca.gov/Patton/Facilities.html.

### The Active COVID-19 Outbreak at DSH-Patton

7. Until late May 2020 when the virus reached DSH, Defendants did not provide public information regarding the number of patients and staff at its facilities who tested positive for COVID-19. From then on, I have tracked the information published by DSH regarding the COVID-19 outbreak within and across facilities, including at DSH-Patton.

8. Attached as **Exhibit C** are true and correct copies of webpages maintained

by DSH tracking COVID-19 infections at DSH-Patton since October 23, 2020.  The webpages show that, as of December 11, 2020, DSH-Patton has had 314 patients test positive for COVID-19 since May 16, 2020, and 329 staff and onsite personnel test positive for COVID-19 since March 20, 2020.  There have been 89 new patient cases at DSH-Patton since December 4, 2020, and 113 since November 27, 2020.  DSH's COVID-19 Tracking website is available at https://www.dsh.ca.gov/COVID-19/Patient_and_Staff_COVID-19_Tracking.html.

9. DSH's COVID-19 Tracking website also states that patients have died after testing positive for COVID-19 at DSH-Patton.  In the course of my work, I have been notified that at least 10 DSH-Patton patients who tested positive for COVID-19 have died, including at least three patients in the last week.  Additionally, the website notes that there have been 11 patients positive for COVID-19 while at acute hospitalization.

10. On December 7, 2020, DSH counsel informed me that Plaintiffs Longstreet and Waldrop had tested positive for COVID-19.  Subsequently, I learned that Plaintiff Hernandez had tested positive as well.

11. Attached as **Exhibit D** is a true and correct copy of the DSH webpage describing Defendants' response to COVID-19.  Since the onset of the COVID-19 pandemic, Defendants have implemented certain COVID-19 policies and procedures that apply to all patients and staff within DSH-Patton.  These policies and procedures relate to infection control for all patients and staff within the facility, including testing for COVID-19, quarantining patient units, modifications to patient programming, and the use of Personal Protective Equipment for staff.  The webpage is available at https://www.dsh.ca.gov/COVID-19/Protocols_and_Workflow.html.

12. I have reviewed the policies and procedures on DSH's website.  These policies fail to include a number of critically important measures necessary to adequately protect patients at high-risk for severe illness or death from COVID-19, such as maintaining a list of high-risk patients, expediting discharge planning for high-risk

patients, transferring high-risk patients to non-congregate or less congregate settings, or reducing the overall patient population to allow for greater social distancing.

### Recommendations from the Substance Abuse and Mental Health Services Administration and the American Medical Association Relating to COVID-19

13. In the course of my work, I have consulted guidance from the federal Substance Abuse and Mental Health Services Administration ("SAMHSA") relating to COVID-19. On May 7, 2020, SAMHSA provided revised guidance on the treatment of patients with mental health disorders during the pandemic, recommending that "outpatient treatment options, when clinically appropriate, be used to the greatest extent possible." SAMHSA recommended that inpatient psychiatric treatment, like that at DSH-Patton, be reserved for individuals "with mental disorders that are life threatening." A true and correct copy of that guidance, entitled *Considerations for the Care and Treatment of Mental and Substance Use Disorders in the COVID-19 Epidemic* is attached as **Exhibit E** and is available at https://www.samhsa.gov/sites/default/files/considerations-care-treatment-mental-substance-use-disorders-covid19.pdf.

14. Attached as **Exhibit F** is a true and correct copy of guidance issued by SAMHSA titled *Covid19: Interim Considerations for State Psychiatric Hospitals* (dated May 8, 2020). In this guidance, SAMHSA notes that many patients in state psychiatric hospitals have health comorbidities that increase their risk of severe illness from COVID-19, including COPD, lung disease, diabetes, hypertension, and heart disease. This guidance is available at https://www.samhsa.gov/sites/default/files/covid19-interim-considerations-for-state-psychiatric-hospitals.pdf.

15. Attached as **Exhibit G** is a true and correct copy of a press release issued by the American Medical Association ("AMA") titled *AMA policy calls for more COVID-19 prevention for congregate settings* (dated Nov, 17, 2020). The AMA has called for the release of people living in correctional facilities who have serious medical conditions

and/or advanced age, in order to protect them from the heightened risk of COVID-19 infection. This press release is available at https://www.ama-assn.org/press-center/press-releases/ama-policy-calls-more-covid-19-prevention-congregate-settings.

### There are Large Number of Individuals who are High Risk for Severe Illness or Death from COVID-19 at DSH-Patton.

16. In the course of my work, I regularly consult the Centers for Disease Control and Prevention's ("CDC") website listing the conditions that put people at high-risk for complications from COVID-19, which is updated regularly. Attached as **Exhibit H** is a true and correct copy of pages from this website as of December 7, 2020, which are also available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, and https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

17. The CDC's website states that adults of any age with the following conditions are at increased risk of severe illness from the virus that causes COVID-19: cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD"); heart conditions, such as heart failure and coronary artery disease; weakened immune system; obesity (defined as having a Body Mass Index ("BMI") of 30 or higher); and Type 2 diabetes.

18. This website also indicates that adults might be at an increased risk for severe illness from the virus that causes COVID-19 if they have: moderate-to-severe asthma; cerebrovascular disease; cystic fibrosis; hypertension or high blood pressure; immunocompromised state; neurologic condition; liver disease; overweight; pregnancy; pulmonary fibrosis; thalassemia; type 1 diabetes.

19. In addition, the CDC's website states that people from racial and ethnic minority groups, including Black and Latinx/Hispanic populations, are at increased risk of getting sick and dying from COVID-19.

20. The CDC's website also indicates that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. The website indicates a steep increase in risk starting at age 50, for whom the risk of death is 30 to 630 times higher than younger adults (ages 18-29).

21. Attached as **Exhibit I** is a true and correct copy of DSH's 2018 Annual Report, showing that, at that time, 12% of DSH patients were over the age of 60. The Annual Report also states that twenty 26% of DSH patients are Black and that 24% are Hispanic. The Annual Report is available at https://www.dsh.ca.gov/Publications/Reports_and_Data/docs/2018_Annual_Report.pdf.

22. In the course of my work of behalf of people with mental illness, including those at DSH-Patton, I have also consulted various academic studies showing that people with mental illness are more likely than the general population to live with serious medical conditions and chronic disease.

23. Attached as **Exhibit J** is a true and correct copy of an article titled *Physical Illness in Patients with Severe Mental Disorders: Prevalence, Impact of Medications and Disparities in Health Care* that was published in WORLD PSYCHIATRY in 2011, discussing the prevalence of chronic disease in people with mental illness. The study is available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3048500/. This article discusses how the lifespan of people with severe mental illness (SMI) is shorter compared to the general population, primarily due to physical illness. Among the physical illnesses that are more prevalent among people with severe mental illness as compared to the general population are nutritional and metabolic diseases, cardiovascular diseases, viral diseases, respiratory tract diseases, musculoskeletal diseases, and possibly obesity-related cancers.

24. Attached as **Exhibit K** is a true and correct copy an article titled *Obesity and Serious Mental Ill Health: A Critical Review of the Literature* published in HEALTHCARE in 2014, discussing the prevalence of obesity-related medical conditions, such as type 2 diabetes and cardiovascular disease, in people with mental illness. This article discusses

research showing that approximately 52% of people with serious mental illness are obese, and references a recent North American study finding that nearly 80% of people with diagnoses of schizophrenia, bipolar disorder or depression are overweight or obese. The publication is available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4934464/.

25. Attached as **Exhibit L** is a true and correct copy of an article titled *Diabetes and Prediabetes Prevalence by Race and Ethnicity Among People with Severe Mental Illness*, published in DIABETES CARE in 2018, showing that people with mental illness are at higher risk for obesity and type 2 diabetes. The article is available at https://care.diabetesjournals.org/content/early/2018/05/14/dc18-0425.

26. Attached as **Exhibit M** is a true and correct copy an article titled *Prevalence, Incidence and Mortality from Cardiovascular Disease in Patients with Pooled and Specific Severe Mental Illness: A Large-Scale Metanalysis of 3,211,768 patients and 113,383,368 Controls* published in WORLD PSYCHIATRY in 2017, showing that people with serious mental illness are at higher risk for coronary heart disease, vascular disease and congestive heart failure, and that approximately 10% of people with serious mental illness have at least one form of cardio-vascular disease. The study is available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5428179/.

27. Attached as **Exhibit N** is a true and correct copy of a study titled *Findings of a U.S. National Cardiometabolic Screening Program Among 10,084 Psychiatric Outpatients*, published in PSYCHIATRIC SERVICES in 2010, finding that approximately 51% of people with serious mental illness have hypertension. The study is available at https://pubmed.ncbi.nlm.nih.gov/20810587.

**Defendants have been Aware of the Risk of Plaintiffs' Health and Safety for Months.**

28. On March 21, 2020, Governor Newsom signed Executive Order N-35-20, which provided Defendant Clendenin with special authority "to protect the health, safety and welfare of patients with mental or behavioral health conditions committed to the state Department of State Hospitals facilities…" because of threat from COVID-19. Under

this new authority, Defendant Clendenin could "issue directives waiving any provision or requirement of the Welfare and Institutions Code; [or] any provision or requirement of the Penal Code that affects the execution of laws relating to care, custody, and treatment of persons with mental illness committed" to DSH.  A true and correct copy of Executive Order N-35-20 is attached as **Exhibit O**.

29. Beginning in April 2020, Plaintiffs' counsel advised Defendant Clendenin of the elevated risk to Plaintiffs and other patients in the state hospitals from COVID-19 due to the nature of the dense, congregate setting and age and health conditions of many of the patients.  Attached as **Exhibit P** is a true and correct copy of a letter sent to Defendant Clendenin on April 20, 2020, encouraging her to use her authority to expedite discharge for at risk patients.

30. Attached as **Exhibit Q** is a true and correct copy of a letter sent to Defendant Clendenin dated May 20, 2020, in which Plaintiffs' counsel again advocated for the expedited discharge for at risk patients and provided additional information on the Defendants' authority to so, both through their traditional powers and through the powers granted Defendant Clendenin through Executive Order N-35-20.

31. Defendants publicly recognized the danger to patients in their facilities from COVID-19.  On August 19 and 20, 2020, I received carbon copies of letters sent to twelve counties (Alameda, Contra Costa, Los Angeles, Modoc, Monterey, Napa, Orange, San Francisco, Santa Clara, Shasta, Stanislaus, and Tulare) regarding Lanterman-Petris-Short Act patients ready for discharge but still confined in DSH facilities.  Those letters are attached as **Exhibit R**.  In the letters, DSH noted that "approximately 25 percent [of its patient population] is over the age of 60 and … that persons diagnosed with mental illnesses have a 20-percent increased risk of morbidity and mortality than the general population."  Further, DSH acknowledged in the letters that "[c]ongregate living facilities such as DSH present increased risk of exposure of COVID-19 to patients who are already at heightened risk of contracting the virus due to these underlying medical conditions or

age."

## Class Representatives and Limited Financial Resources

32. I have spent a great deal of time interviewing the Plaintiffs named in this action, and have spent many hours reviewing their records and corresponding with each of them. Based on my review, it is my belief that Plaintiffs Longstreet, Hernandez, Gluck, and Waldrop are committed to the vigorous representation of the putative Class in this case.

33. Based on my work with the named Plaintiffs, as well as scores of other residents of DSH-Patton, I am not aware of information that would indicate that these Plaintiffs have interests adverse to those of unnamed class members. I am confident that, as Class Representatives, these Plaintiffs share interests with the Class and will fairly and adequately protect the interests of unnamed Class members in this action.

34. My understanding is that Plaintiffs Longstreet, Hernandez, Gluck, and Waldrop, like most patients in the Department of State Hospitals, have very limited financial resources. By statute, when the personal account of a patient in a DSH facility exceeds $500, the excess may be applied to the cost of the care, support, maintenance, and medical attention of the patient. *See* Cal. Welf. & Inst. Code § 7281.

## The Parties Have Met and Conferred.

35. Plaintiffs counsel met and conferred with Defendants' counsel on December 4, 2020. We discussed the substance of Plaintiffs' motions for class certification and for expedited relief, in the form of a motion for preliminary injunction or a temporary restraining order. Plaintiffs counsel informed Defendants they would determine the type of expedited relief to seek the following week, based on the status of the current COVID-19 outbreak at DSH-Patton, and intended to file on December 14.

36. On December 10, 2020, I informed Defendants' counsel that, based on an increase of more than one hundred cases in the past two weeks, including three of the plaintiffs, Plaintiffs intended to file for a temporary restraining order or, in the alternative,

a preliminary injunction.

37. My understanding is that Defendants oppose the application.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed on the 13 day of December, 2020 at Oakland, California.

_____
ANNE HADREAS